1                    UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF NORTH CAROLINA
2                         ASHEVILLE DIVISION

3    UNITED STATES OF AMERICA      )
                                   )
4                                  )
                                   )
5              vs.                 )
                                   )    DOCKET NO.
6                                  )    1:19-cr-28-MR-WCM-2
                                   )
7    RODNEY DEJUAN ALLISON,        )
                                   )
8                                  )
     Defendant.
9

10                  TRANSCRIPT OF SENTENCING HEARING
                 BEFORE THE HONORABLE MARTIN REIDINGER
11               UNITED STATES DISTRICT COURT JUDGE
                         FEBRUARY 24, 2022
12

13   APPEARANCES:

14   On Behalf of the Government:

15       Thomas M. Kent,
         United States Attorney's Office
16       100 Otis Street
         Asheville, North Carolina  28801
17
     On Behalf of the Defendant:
18
         James G. Banks, Jr.
19       Banks Weaver, LLC
         100 Peachtree Street, Suite 260
20       Atlanta, Georgia  30303

21       William H. Thomas, Jr.
         The W.H. Thomas Firm, LLC
22       511 East Paces Ferry Road
         Atlanta, Georgia  30305
23
              Deborah Cohen-Rojas, C.S.R., R.D.R., C.R.R.
24                    Official Court Reporter
         Deborah_CohenRojas@ncwd.uscourts.gov  704.350.7497
25   *Proceedings recorded by mechanical stenography, transcript
            produced by computer-aided transcription.*

1          THE COURT:  The next matter that we have that's on the

2    calendar today is United States versus Rodney Dejuan Allison,

3    which is before the Court for the sentencing of the defendant

4    pursuant to his plea of guilty on the charge of conspiracy to

5    possess with intent to distribute controlled substances in

6    violation of 21 U.S.C. Sections 841 and 846.

7          Now, since I don't have local counsel to introduce you,

8    I'll let pro hac counsel tell me who they are and announce your

9    appearance on the record.

10          MR. THOMAS:  Good afternoon, your Honor.  I'm William

11   Thomas.  Again, as the Court's noted, we're here from Atlanta.

12   I represent Mr. Allison, along with --

13          MR. BANKS:  Gabe Banks, and I'm also from Atlanta, as

14   well, Judge.  Good morning.  It's certainly a pleasure to

15   appear in front of you.

16          THE COURT:  Well, I welcome you to this court, look

17   forward to hearing from you in this matter.

18      Is the defendant prepared to proceed?

19          MR. THOMAS:  I believe so, your Honor.  We're ready to

20   proceed.

21          THE COURT:  Okay.  Mr. Kent, is the Government

22   prepared to proceed?

23          MR. KENT:  Yes, your Honor.

24          THE COURT:  In preparation for the hearing today, I

25   have reviewed, again, the objections to the presentence report.

1  I have seen a motion for downward departure that came from the

2  Government.

3       I have seen, actually, three different sentencing

4  memoranda.  There was one that was filed on behalf of the

5  defendant back in October of 2020, I have seen one from the

6  Government responding to the defendant's objections, and then

7  there was another memorandum filed on behalf of the defendant

8  that was filed yesterday.  It was not filed in accordance with

9  our local rules, but it was filed yesterday.

10      The one from October of 2020 had accompanying it various

11 letters of support, and there was also a report, an expert

12 report, that went with it.  Are there any items that have been

13 submitted in anticipation of this hearing that I did not

14 mention?

15      Mr. Thomas, any for the defendant?

16          MR. THOMAS:  No, your Honor, I don't think so.

17          THE COURT:  Mr. Kent, anything else for the

18 Government?

19          MR. KENT:  No, your Honor.  Thank you.

20          THE COURT:  I will note, regarding that second

21 sentencing memorandum on behalf of the defendant, -- I'll ask

22 you all the same question that I would ask any other lawyer

23 who did that.  And that is, when did you think I was going to

24 read it?

25          MR. THOMAS:  Your Honor, to the extent we have not

filed at the time as we should, that's on the attorneys.  As
this Court knows, this case has had a lot of moving parts.  I'd
really prefer not to go further on that, but it is -- I will
tell you this, again, just to give the Court a brief
introduction about myself.

I spent a year sitting on the other side of the table and
appreciate the timeliness issues.  I'll just say this.  We
failed in that regard, and I'd just ask the Court to excuse
that for purposes of this hearing.

THE COURT:  Well, and to that extent, first of all,
our local rules say, if you're going to submit any sentencing
memorandum, it has to be filed with the Court through the ECF
system at least 27 days prior to the sentencing hearing.
That's the technical transgression.

The hard part is, if you file it the night before, the
day before the hearing, I don't have a lot of opportunity to
read it.  Now, I'll tell you, I did read it.  In fact, I read
it twice.  And I'm not going to do to you like what Woodrow
Jones -- predecessor, Woodrow Jones -- (indicating) -- has done
to many a lawyer in his day of saying, do you want me to read
or do you want to talk?  I'm not going to do that.

I read it.  I'm going to give you the opportunity to
argue.  But to the extent that you may come back here in the
future, please don't do this.

MR. THOMAS:  I understand, your Honor.  And I

1   appreciate that.  And the only other thing I would indicate --

2   and, again, you know, I'm not going to stand here and make

3   excuses.  We failed in that regard.

4        We did attempt to file it under seal, and I had the

5   potential to file it a little earlier and wasn't familiar with

6   the proceedings on how to do that.  And so that probably

7   delayed it a bit.  Again, no excuse, and I -- again, I

8   appreciate the Court's indulgence.

9            THE COURT:  Well, you actually raised the next issue

10  that I wanted to talk to you about, and that is you made a

11  motion to seal, but, as you may be aware -- or at least you

12  should be aware -- that in the Fourth Circuit there is a case

13  about sealing sentencing memoranda called US v. Harris.  You

14  didn't comply with anything having to do with US v. Harris.

15       So what I'm going to do is, later today, I'm going to

16  enter an order denying your motion to seal.  I will allow that

17  memorandum to remain provisionally under seal for a period of

18  maybe 10 days or so while you all go ahead and comply with

19  US v. Harris.  That involves filing a motion, filing an

20  unredacted and a redacted version of the memorandum.  And

21  US v. Harris tells you what things need to be redacted and what

22  things have to be on the public record.

23       We don't do things in private here.  There are certain

24  things that have to be, but we -- a wholesale sentencing

25  memorandum that expresses the relief that you want on behalf of

1 the defendant cannot be, in toto, filed under seal.

2         MR. THOMAS:  I understand, your Honor.

3         THE COURT:  So please take care of that.  Don't let

4 that get away from you because, if it does, at the end of that

5 period of time, the memorandum that's provisionally under seal

6 goes on the public record.

7         MR. THOMAS:  I understand.

8         THE COURT:  So please keep that in mind.

9         MR. THOMAS:  Thank you, your Honor.

10         THE COURT:  Mr. Allison, I need for you to stand,

11 please.

12      Do you recall appearing before the magistrate judge on or

13 about the 1st day of November back in 2019 for the purpose of

14 entering a plea of guilty in this case?

15         THE DEFENDANT:  Yes, sir.

16         THE COURT:  Do you remember being sworn in or placed

17 under oath at that time?

18         THE DEFENDANT:  Yes, sir.

19         THE COURT:  Do you remember answering the questions of

20 the magistrate judge?

21         THE DEFENDANT:  Answering the questions?

22         THE COURT:  Right.  Do you remember that the

23 magistrate judge, during that hearing, he asked you a whole

24 series of questions, and you had to answer them?

25         THE DEFENDANT:  Yes, sir.

1      THE COURT: Now, as part of that proceeding, is it

2   correct that you signed what was called a plea inquiry form,

3   where those answers -- your answers to all those questions were

4   on a piece of paper, and there were check marks and everything,

5   and then, at the end, you checked all those answers, and then

6   you signed it? Is that correct?

7      THE DEFENDANT: Yes, sir.

8      THE COURT: When you signed that plea inquiry form, it

9   indicated that your -- the answers that you gave to the

10  magistrate judge were true and correct. Is that right?

11     THE DEFENDANT: Yes, sir.

12     THE COURT: Now, were your answers that you gave to

13  the magistrate judge, in fact, true and correct? In other

14  words, did you tell him the truth?

15     THE DEFENDANT: Yes, sir.

16     THE COURT: Now, if I went back through all those

17  questions again today -- and I think that your attorney is

18  showing you a copy of that list of questions. If I went back

19  through all of those questions again here today, would your

20  answers be the same as what they were back then?

21     THE DEFENDANT: Yes, sir.

22     THE COURT: Now, Mr. Thomas and Mr. Banks, you did not

23  represent Mr. Allison as of the time of his plea; is that

24  correct?

25     MR. THOMAS: That is correct, your Honor.

1    THE COURT:  However, based on what you are aware of in
2 your representation of Mr. Allison, from whatever source, are
3 you satisfied that he fully understood the questions that were
4 asked of him by the magistrate judge at his Rule 11 hearing?

5    MR. THOMAS:  I am indeed, your Honor, particularly
6 based on the document that the Court just referred to.

7    THE COURT:  Are you satisfied that he has fully
8 understood the questions I have asked him here today?

9    MR. THOMAS:  I am, your Honor.

10    THE COURT:  And, Mr. Allison, did you answer all of
11 those questions the way that you did and are you pleading
12 guilty because you did, in fact, commit the crime with which
13 you are charged?

14    THE DEFENDANT:  Trying to just figure out what -- what
15 crime they had me charged with.

16    THE COURT:  Well, the crime that you pleaded to was
17 conspiracy to possess with intent to distribute controlled
18 substances in violation of 21 United States Code Sections 841
19 and 846.

20    THE DEFENDANT:  Yes, sir.

21    THE COURT:  Is your plea of guilty the result of any
22 threat or force or promise, other than the promises in your
23 plea agreement?

24    THE DEFENDANT:  No, sir.

25    THE COURT:  Are you pleading guilty voluntarily?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  Now, in this case, you pleaded guilty

3 pursuant to a plea agreement.  And in that plea agreement, you

4 have agreed and the Government has agreed to certain facts and

5 certain factors for sentencing.  But under the law, I'm not

6 required to accept those facts or those factors just because

7 both sides have agreed.  And if I declined to accept any of

8 those facts or factors in my sentencing decision, that will not

9 give you the right to withdraw your plea.  Do you understand

10 that?

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  Based upon the representations made to the

13 Court and the answers given by the defendant at the Rule 11

14 hearing before the magistrate judge, the Court finds,

15 concludes, and confirms that the defendant's plea is knowingly

16 and voluntarily made and that the defendant understands the

17 charges, potential penalties, and consequences of his plea.

18      Mr. Thomas, does the -- does the defendant stipulate that

19 there is a factual basis to support his plea of guilty entered

20 in this case and, further, that the Court may accept the

21 evidence as set forth in the presentence report, which includes

22 the factual-basis document that was adopted at the Rule 11

23 hearing, as well as the statement of relevant conduct that was

24 submitted by the Government thereafter, all as establishing

25 such factual basis?

1      MR. THOMAS:  Your Honor, we agree that there is a

2 factual basis for Mr. Allison's plea, particularly as set forth

3 in the factual basis that he signed off on.  That's correct.

4 As the Court notes, we do have some objections to the

5 presentence report, but, yes, we agree there's a factual basis.

6      THE COURT:  Well, I need to make sure I have a clear

7 record as to what I'm supposed to find the factual basis is.

8 I'm not asking about your objections to some of the findings of

9 the probation officer --

10      MR. THOMAS:  With that, your Honor, we agree, then,

11 that there's a factual basis.

12      THE COURT:  Well, and in addition to agreeing that

13 there is a factual basis, does the defendant stipulate that the

14 factual-basis document that was adopted at the Rule 11 hearing

15 that is recounted verbatim in the presentence report and that

16 the statement of relevant conduct that the Government has

17 submitted to the Court that is also recounted verbatim in the

18 presentence report -- that those two documents set forth what

19 the factual basis is for the plea?

20      MR. THOMAS:  Yes, your Honor.

21      THE COURT:  Mr. Kent, does the Government stipulate?

22      MR. KENT:  Yes, your Honor.

23      THE COURT:  Based on the stipulation of the parties

24 and the evidence set forth in the presentence report -- that

25 being the factual-basis document and the statement of relevant

1 conduct, all of which have been previously reviewed by the

2 Court -- and based upon the defendant's admission of guilt, the

3 Court finds, concludes, and confirms that there is a factual

4 basis for the defendant's plea.

5 Accordingly, the Court confirms the magistrate judge's

6 acceptance of the defendant's guilty plea, and this Court has

7 accepted and does accept the defendant's plea of guilty, finds

8 the defendant is guilty, and enters thereon a verdict and

9 judgment of guilty.

10 Mr. Allison, there is a document that has been prepared by

11 the probation officer. The document that I'm talking about, on

12 its front page on the upper left-hand side, has a caption that

13 reads "United States of America Versus Rodney Dejuan Allison,"

14 and then, on the upper right-hand side of the front page, has a

15 title that reads "Presentence Investigation Report." It's the

16 document that your attorney was just talking about a minute

17 ago.

18 Have you seen the document that I'm talking about prior

19 to today? I see that your attorney is now showing you a

20 copy of --

21 THE DEFENDANT: Yes.

22 THE COURT: So you've seen that document before today;

23 is that right?

24 THE DEFENDANT: Yes.

25 THE COURT: Have you had an opportunity to review it

1  with your attorney?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Do you understand the contents of that

4  document?

5      (Discussion off the record.)

6          THE DEFENDANT:  Oh, yes.

7          THE COURT:  And, Mr. Thomas, have you had an adequate

8  opportunity to review the presentence report with Mr. Allison?

9          MR. THOMAS:  We have, your Honor.

10          THE COURT:  Are you satisfied that he understands the

11  contents of the presentence report?

12          MR. THOMAS:  I am, your Honor.

13          THE COURT:  Okay.  Thank you, Mr. Allison.  You may be

14  seated.

15      Before we proceed with the next phase having to do with

16  the presentence report, in light of the complexities of today's

17  hearing, I want to make sure that I understand how we're going

18  to go forward.

19      The first thing I want to ask about has to do with the

20  pending issue of forfeiture because usually I get to this point

21  and there's a consent order of forfeiture.  And I know that

22  here the Government has made a motion for forfeiture and has

23  tendered a proposed order, but I don't see where there's a

24  consent order.

25          MR. KENT:  Your Honor, if I may, I -- I've addressed

1  that issue with both Mr. Thomas and Mr. Banks.  And prior to

2  court today, they -- we all signed a proposed consent order, a

3  judgment of forfeiture forfeiting the defendant's interest in

4  the items that are listed in the indictment, all of the items,

5  which I'd like to hand up now to Miss Miller, your Honor.

6          THE COURT:  You may approach and hand that up.

7          MR. KENT:  (Indicating.)

8          THE COURT:  The next thing that I want to address,

9  just to understand how we are going to go forward -- because

10  the next thing that we need to dispose of would be any

11  objections to the presentence report, but is there -- is there

12  anything that either side is seeking to present by way of

13  evidence before we move on to that?

14          MR. KENT:  Your Honor, the Government's not seeking to

15  introduce witnesses or call witnesses.  I'm going to rely on

16  the very lengthy response that I made, which is -- a lot of it

17  is based upon things that were filed, essentially, or sworn to

18  under oath by the codefendants or admissions in the case, your

19  Honor.

20          THE COURT:  Okay.  Mr. Thomas, is that likewise

21  correct with regard to the defendant?

22          MR. THOMAS:  That's correct, your Honor.  We have no

23  witnesses with regards to the objections that we'll be

24  addressing today.

25          THE COURT:  Do you -- with that qualifier, are you

1  planning to call any witnesses about any topic as part of this

2  hearing?

3         MR. THOMAS:  I do note that Mr. Allison has family

4  members here, and I would probably just introduce them to the

5  Court.  I don't expect to call them, to have them sworn as

6  witnesses.

7         THE COURT:  Okay.  At what point are you wanting to do

8  that?  And are you just wanting to introduce them so that I

9  understand that they're here in support of Mr. Allison --

10        MR. THOMAS:  That's correct, Judge.

11        THE COURT:  -- or were you wanting something more than

12 that?

13        MR. THOMAS:  No, that's the -- the former, just to

14 introduce them in support of Mr. Allison.

15        THE COURT:  Well, and I would say, if you're wanting

16 to do that, let's turn to that right now so that I understand

17 who's here on behalf of Mr. Allison.

18        MR. THOMAS:  Your Honor, Mr. Allison's wife is here,

19 Latasha Allison, and I believe she's with Mr. Allison's young

20 son, Zamore (phonetic) Allison.

21        THE COURT:  Okay.

22        MR. THOMAS:  Can you just stand so the Court --

23 can you all stand up for the Court so the Court can see you?

24 Thank you.

25        And that's really what we wanted to do, and that's really,

again, more so that the Court knows that Mr. Allison is here,
he's here with his family, and that they support him in these
efforts.  I think that will be probably relevant just to some
arguments I'll be making to the Court towards the end of this
proceeding.

THE COURT:  Okay.  Very good.  Thank you.

Well, let's turn, then, to the objections to the
presentence report.  And particularly, the sentencing
memorandum that was filed very clearly delineated which
objections were withdrawn and which ones were not.

So let's -- let's turn to the objections and -- actually,
all of the remaining objections, if I understand correctly, are
the ones that pertain to the calculation of the offense level
and, thus, the calculation of the guideline range.  First let's
look at the enhancement that is in paragraph 95.  Of course,
all -- this enhancement is under the drug guideline
2D1.1(b)(1).

Mr. Thomas, I read what you put in the sentencing
memorandum, but I guess my first question for you is -- as you
know, the -- I refer to it as the nexus provision.  The
connection between a gun and any sort of controlled-substance
transaction for the enhancement under 2D1.1 is a really low
bar.  All the other nexus provisions in the guidelines are
very, very different, but 2D1.1 is not.  It's a low, low bar.
Why do you say that that one doesn't apply here?

1    MR. THOMAS:  Your Honor, I'm going to be very brief on

2  this.  I certainly spent some time in Mr. Kent's seat.  I have

3  no disagreement on the actual law.  This is my argument with

4  regards to that, is that Mr. Allison, himself, was not arrested

5  with any firearms himself.

6    The firearms that were seized in this case were seized

7  from locations that others had access to that -- and I'll be

8  making some arguments shortly about -- I think my more

9  extensive argument will come with regards to the role in the

10  offense.  But I think that it's important to note -- and this

11  Court knows, has had some experience with this case over the

12  past several years, really -- that there were others with --

13  who were distributors of drugs in this particular case.

14    There were others with access to those facilities.  And

15  those -- our argument and our position, with the understanding

16  what the Court has just stated about the low bar, is there were

17  others with access to those, and those firearms were possessed

18  by others, and that doesn't relate to Mr. Allison.  And we'd

19  just ask the Court to sustain our objection in that regard.

20    THE COURT:  Mr. Kent, what do you say in response?

21    MR. KENT:  Your Honor, I would like to primarily rely

22  upon my -- it's probably the longest sentencing memorandum or

23  objection to response I've ever done.  And I laid out a number

24  of different examples from the evidence in the case to

25  establish a basis for this particular enhancement and

1  specifically the nexus between those firearms and the
2  defendant.

3       The only thing that I would add that's different from what
4  I submitted previously is, since that time, Mr. Perry also
5  pleaded guilty and, of course, had a factual basis, and it was
6  certified to the truth what was in his factual basis.

7       And as to Mr. Smith, he asserted that the 25 Ora Street
8  residence was the defendant's residence, the 296 Gap Creek
9  Road, Apartment C, in Fletcher was the alternate residence and
10 used as a stash apartment, and, finally, also that they each
11 possessed the controlled substances with the intent to
12 distribute them, referring to the Fletcher apartment, as well
13 as possess the firearms therein in furtherance of their
14 drug-trafficking activities.

15      I think what the Government's previous response laid out
16 was that, again, there are a number of examples from those
17 factual bases where these guns were recovered from places the
18 defendant had dominion and control over, in close proximity to
19 drugs or a ledger or large quantities of cash, things that were
20 endemic to this drug-trafficking business.

21      And I certainly think, under that very low standard for a
22 guideline enhancement, that the Government's met its burden and
23 that this particular enhancement does apply in this particular
24 case, your Honor.

25           THE COURT:  Well, with regard to the objection to the

1 enhancement in paragraph 95 regarding the firearm or firearms,
2 of the firearms that are at issue in this enhancement, based on
3 the evidence that is in the record and has been presented, are
4 firearms that were located in areas over which the defendant
5 had dominion and control and that those were locations --
6 particularly the ones just identified or mentioned by the
7 assistant United States attorney at Ora Street, as well as Gap
8 Creek Road -- were locations where the evidence before the
9 Court shows that drug-distribution activity occurred.

10     The standard under 2D1.1(b)(1) is that, once it is
11 established that there was the presence of the unlawful
12 controlled substance and the presence of the firearm within the
13 dominion and control of the defendant, that there must be
14 circumstances that show that they are clearly unrelated;
15 otherwise, the enhancement applies.

16     I don't see anything in the record that shows that they
17 were clearly unrelated.  In fact, the record that is before the
18 Court shows that there was at least some degree of connection
19 between the presence of the firearms and either the storage of
20 or distribution of the firearms or the -- or excuse me -- the
21 distribution of the controlled substances or the proceeds
22 thereof.  Therefore, the low bar of 2D1.1(b)(1) is met, and the
23 objection is overruled.

24     Next I want to move on to paragraph 96 and the two-level
25 enhancement for maintaining a premises.  Maybe I should have

1  started there because it is the maintenance of the premises

2  that was also an element to the firearms issue.

3       But, Mr. Thomas, I'll hear from you on that one, as well.

4       MR. THOMAS:  Thank you, your Honor.  Again, I will be

5  brief.

6       Our objection, really, is that factually Mr. Allison has

7  always maintained that, particularly at the time that the

8  search warrant was executed, he was residing at another

9  apartment that was not his, that he was not maintaining -- he

10  was not maintaining that residence for the purpose of

11  distribution of any type of controlled substances.

12       There were some items found, and I would just note one in

13  particular that's been referenced in the presentence report, I

14  believe, a prescription that was there that was in

15  Mr. Allison's name.  And that prescription, I think was not

16  noted in there, was perhaps three years old.  So that's our

17  objection, and we ask the Court to sustain the objection -- our

18  objection as to maintaining that stash house.

19       THE COURT:  Okay.  Mr. Kent, what says the Government?

20       MR. KENT:  Your Honor, again, primarily relying upon

21  my prior response, as well as the additional information

22  provided through Mr. Perry, the argument about the prescription

23  bottle aside, which was at the Fletcher apartment, there are

24  plenty of other examples within the facts of this case and the

25  statement of relevant conduct, for example, that establish this

enhancement, that the defendant was, in fact, maintaining multiple residences that would qualify for this particular enhancement.

I would argue that the Fletcher apartment was, in fact, a stash house. Drugs were literally stashed inside the furniture there. There was literally equipment, razor blades, scales, baggies used to package up crack cocaine. Those crack baggies that were found were very consistent with crack that was sold by the defendant during the controlled buys. There were guns there.

Of course, it was also protected by a video surveillance system. A more extensive surveillance system was at his residence at 25 Ora Street, where, again, there were multiple guns, ammunition, drugs, cash, the ledger which the codefendants -- two of them, Prophet Allah, Mr. Downs, as to how much money they owed.

And then, of course, there were statements by co-conspirators that the defendant would also have his drugs stored throughout a number of apartments within the Bartlett Arms, which is less than a mile from this courthouse. And they named those apartments, 503, 505, 129, and 107.

So certainly there are a number of different examples the Court could find where the defendant maintained a premises, whether it's his own or having someone do it for him, where they were at least maintained for the storage of drugs, if not

the distribution of drugs. So I would ask that you overrule the objection and apply the enhancement, your Honor.

THE COURT: Just so I'm clear, when you talk about the Fletcher apartment --

MR. KENT: Yes.

THE COURT: -- are you talking about Gap Creek Road?

MR. KENT: Yes, sir, 296. Yes, sir.

THE COURT: Well, with regard to the maintaining the premises enhancement, under Subsection (b)(12), again, very much like what we just discussed concerning the firearm enhancement under D21.1, the bar is quite low regarding the maintaining of a premises.

The case law from the Fourth Circuit is that, even if there are other uses, other reasons, for maintaining a particular premises, that, so long as the premises are used in part for the purpose of facilitating the distributing of controlled substance or even the proceeds thereof, that that warrants the application of this enhancement.

And here I have to say the evidence that is before the Court, including in the statement of relevant conduct and the other areas that have been presented to the Court, present greater evidence of maintaining a premises for such purposes regarding controlled substances than I ordinarily see, particularly including such things as the nature of the surveillance systems, the manner in which the controlled

1   substances were, in fact, stored at such locations.

2        Each of those things show the intent to use the locations

3   relative to the controlled-substances offenses and that,

4   therefore, I believe that that evidence supports a finding that

5   the defendant maintained a premises -- actually, he maintained

6   more than one premises for that purpose within the meaning of

7   Subsection (b)(12) and, therefore, that objection is overruled.

8        Next I want to turn to the Part 3 enhancement, and that is

9   for the defendant's role in the offense.

10       And, Mr. Thomas, before I turn to you, I -- I suppose the

11  old adage is you never want your client to be the last one to

12  be sentenced in any sort of conspiracy because that gives all

13  the other codefendants the opportunity to build the record

14  against that last defendant.

15       And isn't that exactly what we have here, in that the

16  factual basis of all the co-conspirators essentially establish

17  the enhancement -- the role enhancement for Mr. Allison as a

18  manager or supervisor?  How do you fight against that?  How do

19  you argue against what I already have in the record, having

20  already sentenced all of these other codefendants?

21       MR. THOMAS:  Judge, I don't -- first, I don't disagree

22  with the old adage.  I don't.  I do probably have a little bit

23  more to say about this objection than I do about the others.

24       A case that I've been doing some research this morning --

25  that it did not cite -- I have a copy for the Court.  And my

sentencing memo, I think, outlines our position, and I'll

summarize it and provide the case to the Court.  The United

States versus Slade is a Fourth Circuit case.  I did manage to

find one Fourth Circuit case.  Ultimately I didn't find the

ones on sealing.  But the United States versus Slade, 631 F.3d

185, and that is a -- I believe, a 2010, 2011 case.

In the United States versus Slade, the facts are actually

quite similar to what we have here.  Mr. Allison, he has pled

guilty.  There was a conspiracy.  Mr. Allison is a drug dealer.

That's what he's pled guilty to, and that's what we're here

talking about today.

What Slade talks about is the fact that an association of

individuals who receive drugs, who buy and sell drugs, does not

necessarily warrant a role enhancement.  Mr. Allison -- and

what Slade talks about is that a distributor of drugs really,

without more, is not a -- does not warrant a role.

A point that I would point to is several paragraphs of the

presentence report which I think supports that contention,

paragraph 48, 49, 55, 56, and 58.  In those paragraphs, they

all talk about transactions with Mr. Allison.  And Mr. Allison

didn't have anybody do those deals for him.  He didn't have

anybody deliver those drugs.  He didn't have anybody collect

the money.  He didn't have any of that.  Mr. Allison did those

deals, and that's what we suggest is going on here.

Mr. Allison -- and I think the facts support -- the facts

1  what we all agree to and stipulated on.  The facts support that

2  Mr. Allison supplied drugs to individuals, and then those

3  individuals did what they did with -- I presume further

4  supplied them or intended to further -- to further distribute

5  those to other individuals.

6       I agree that that supports the factual basis for the

7  conspiracy.  I don't agree that it supports a basis for role in

8  this particular case.

9            THE COURT:  Well, what about, for instance, where, in

10 the -- even in the PSR, it talks about Mr. Allison employing

11 lookouts for the deals that he's even involved in himself.  The

12 one I remember in particular is Mr. Mohammed, who essentially,

13 in his factual basis, described himself as a runner, almost a

14 courier, for Mr. Allison, that, in essence, he -- his

15 involvement was only acting at the direction of Mr. Allison.

16 There are other parts here, I think, with regard to Mr. Odum,

17 that go into those facts, as well.

18      That's entirely different from what you're talking about

19 in Slade.  I don't particularly remember the facts of Slade,

20 but, if I remember correctly what the law is, the role

21 enhancement as a supervisor, you're not -- somebody is not a

22 supervisor simply because he sells to a distributor.

23      But the facts here -- at least what Mr. Allison's

24 codefendants are willing to say about him -- say that he's --

25 he did a whole lot more in directing their action than simply

selling to the distributors, or selling to those who then sell

to somebody else.  What do you say to that?

MR. THOMAS:  Your Honor, I -- again, even -- the facts

of Slade talk about there were some individuals who assisted

this -- Mr. Slade in doing what he did.  But the courts

found -- and that was actually a case that was reversed on

plain error.  The Court found that wasn't sufficient.

I am relying on the facts in the presentence report that

talk about, in one of the -- I'm sorry -- in paragraph 80 of

the presentence report, again, I think supports our contention

that this was an association of individuals, yes, who sold

drugs.  But paragraph 80, in Footnote 1, was a transaction that

didn't involve Mr. Allison.

So it wasn't Mr. Allison kind of having control over the

whole enterprise.  Paragraph 80, in Footnote 1, involved two of

these individuals that we're talking about who, again, were

part of this association, but, when somebody needed drugs and

Mr. Allison couldn't be found, that transaction didn't involve

Mr. Allison.  And I think that supports our argument, our

contention, that this is -- that he was not a manager or

supervisor of -- as contemplated by the guidelines.  I would

point out --

THE COURT:  I want to make sure I understand your

argument because it sounds like your argument is, well, there's

this transaction over here that he didn't control; therefore,

1 he's not a supervisor or manager.  That doesn't say anything

2 about these things over here on the other side that he does

3 control.  So, in other words, your argument strikes me as a non

4 sequitur.  Am I misunderstanding you?

5 　　　　MR. THOMAS:  My contention isn't that simply that

6 piece of evidence or that transaction is wholly dispositive of

7 the issue.  But my argument, I think, is -- is trying -- is,

8 looking at the facts holistically, if I run a business or

9 Mr. Allison runs a business, Mr. Allison controls the aspects

10 of that business with those individuals, right?  That's why

11 you -- that's why that person would then get a role.  I mean,

12 that's why Mr. Allison would then get a role, because these

13 were his employees, they work for him, he's directing, he's --

14 you know, he's telling them what to do, he's talking about how

15 much to charge, things like that.

16 　　　That's not -- and I think that that transaction shows that

17 these are individuals who -- what's the word I'm looking for --

18 are -- freelancing is the right word, but they're doing their

19 own thing, so he's not controlling them.  He's not supervising

20 those transactions.  He's not directing those particular

21 transactions.

22 　　　And so I think -- I hope that certainly explains my

23 argument and that I certainly didn't intend for it to be a non

24 sequitur, but that's not what's happening in this particular

25 case.  These are individuals who do their own thing.

1    I think counsel, a moment ago, talked about ledgers that
2 were found with people that owed him money.  Okay?  So again,
3 my argument with regards to that is he's simply a supplier of
4 drugs to other individuals who then further distribute them.
5 And how they do what they do is -- it's really left up to them
6 and that that doesn't warrant a role in this particular case.
7    I'm going to try to read from Slade, if you will, and it
8 cites cases in which a role was appropriate.  And I think -- I
9 think they're very different from what we have here.
10    Bartley, 230 F.3d 673 and 74, where they affirmed the role
11 where the defendant directed the activities of street-level
12 drug dealers and advised them on drug-sale techniques, set
13 prices and payment terms, arranged logistics of delivery, and
14 directed the mailing and transport of drugs.
15    Talib, 55 F.3d 923, the pinpoint cite is at 932.  The
16 enhancement was appropriate where a defendant acted as a
17 manager in a large, criminal enterprise, supervising the
18 preparation of marijuana for shipment and sending out his
19 inferiors to deliver the drugs.
20    And then lastly Brooks, 957 F.2d 1138.  And all of these
21 were Fourth Circuit cases.  Enhancement was appropriate where
22 the defendant paid employees of the drug operation and
23 effectively ran the operation while her husband was ill.
24    And I know the Court cited to at least one other
25 individual who's been here before.  That certainly was one

individual -- I'm trying to, if the Court will indulge me, make
an argument in the alternative. First, I don't think a role is
appropriate here, but, if that's the instance, that one
individual who says he's a lookout -- if that's the one -- the
instance, then certainly a three-level is not appropriate. A
two-level may be appropriate. Our argument is that there
should be no enhancement with respect to this particular set of
facts.

THE COURT: Well, what about particularly the
involvement of Mr. Downs? Because in his factual basis, as I
recall it, he -- he essentially says the only things I did were
in furtherance of what I was told by Mr. Allison. In fact,
where you talk about, oh, they're all free agents, they're all
running their own little business -- well, what Mr. Downs has
pleaded guilty to and admitted to is really the opposite of
that, isn't it?

MR. THOMAS: So my response is this, your Honor.
Certainly, again, I'm going to rely on Slade. And that even --
those -- those instances that the Court is pointing to, I
think, consistent with Slade, don't warrant the adjustment.

Again, I will reference the extent of the adjustment -- if
the Court is inclined not to accept my argument, then, again,
that's not a three-level adjustment. That's a two-level
adjustment. I want to be clear. Our argument is that no
adjustment should apply, but, if the Court disagrees with that,

1  I believe that the facts at best warrant only a two-level
2  adjustment.  And I can hand Slade up to the Court if that's of
3  any assistance to you.

4          THE COURT:  Well, if there are particular parts of it
5  that you want to make sure I focus on -- I do not have a copy
6  of Slade up here.  I've read it in relation to this issue
7  probably a dozen times over the years, but, if there's a
8  particular wording that you want me to focus on, I'll certainly
9  give you an opportunity to hand it up, and I'll look at that.

10         MR. THOMAS:  Well, I think I summarized, again, our
11 major argument.  I don't, you know, have other -- I don't feel
12 the need to direct the Court to any other particular
13 provisions.  I hope the Court understands where we are with
14 regard to this particular adjustment.

15         THE COURT:  Okay.  Thank you.

16         MR. THOMAS:  Thank you.

17         THE COURT:  Mr. Kent, for the Government.

18         MR. KENT:  Thank you, your Honor.  I'd ask you
19 overrule the objection and apply the three-level enhancement.
20 I've read Slade, and I don't believe this case really is
21 similar to Slade, other than that they are both drug
22 conspiracies.

23         The evidence in Slade is that you have a distributor, a
24 person who's been given an enhancement, who's a member of a
25 conspiracy.  And there are -- other than that, it's pretty

much -- there's at least five other people in the conspiracy.
And there's really no evidence, as the Court pointed out, that
anyone within that group had exercised some authority actively
over other participants within that, so I agree.

There, I would -- and I was going to talk about this in my
sentencing argument. I think it's rare to really see -- at
least over my 23 years of doing this, to see some of these
enhancements applied. While they sort of touch on the factors
that are present in the case, they oftentimes -- the cases
don't really fit the enhancement.

But I think here it does, particularly in light of Slade
because Slade provides a number of examples where the
three-level enhancement applies. And I think we have that.
I've already filed a -- again, thorough response to this
particular objection and provided you with multiple examples,
some of which you've recited today from some of the prior
pleas.

But it includes coordinating the activities of others,
which would include controlled -- the controlled drug buys with
the co-conspirators which was done in this case, directing the
terms of payment which was done, arranging the logistics of
delivery, transporting the drugs that was done, and, of course,
as stated by counsel, sending out his inferiors to deliver the
drugs.

So since the filing of my response to that, I -- we would

just point the Court to two other things, two defendants that
you mentioned.  Mr. Mohammed, when he came up for sentencing,
he filed his sentencing memorandum.  He more or less repeated
and maybe further illustrated some of things that are in his
factual basis:  One, that he was picking up drugs from the
defendant and delivering them to co-conspirator Odum; that at
other times he would take the requests from Mr. Odum and
deliver them to the defendant; and, of course, he explained to
the Court that he was being paid a small amount of money to act
as a courier for the defendant.

And then at Mr. Downs's sentencing, I think what became
clear, what the Court recognized, is the driving force behind
this conspiracy was the defendant.  He was the one -- Mr. Downs
had been involved with some fairly small-level buys, I believe,
of crack cocaine and heroin, small bags, small rocks.  But it
was the defendant that really sort of pulled him back or pushed
him into a more significant part of the conspiracy because, one
date, he wanted him to pick up the money.  So he directed him
to pick up the money from Mr. Odum because he did not want
Mr. Mohammed -- or Prophet Allah -- picking up that money.

So I think the record is replete with examples of that
sort of exercise of control over his counterparts that the
defendant really had, where he was being smart and he was
standing back, particularly after the raid that took place
after the Brandie Angel homicide, where he wasn't going to make

1 deliveries himself, so he was going to have his counterparts

2 making the deliveries.

3      This is far more evidence of control than was present in

4 Slade, and it's consistent with the examples cited in Slade

5 where the three-level enhancement does apply, your Honor.

6 Thank you.

7           THE COURT:  Well, with regard to this enhancement, my

8 recollection of Slade -- and maybe this is too much of a

9 shorthand version of it, but that -- the enhancement was not

10 applied there because the defendant, Slade, was essentially a

11 bulk distributor.

12           MR. KENT:  Yes, your Honor.

13           THE COURT:  It was -- the Court found that, just

14 because he distributed large quantities to others and,

15 therefore, understood that they weren't going to use those,

16 that they were distributing to yet third parties, that that

17 didn't make him an organizer or supervisor.

18      The facts of this case, as I read -- and I read back

19 through maybe not all, but almost all, of the factual basis

20 documents of the co-conspirators.  And they didn't tell the

21 Court that they were buying bulk quantities from Mr. Allison

22 for the purposes of redistribution.  They were doing things

23 such as making deliveries at the direction of Mr. Allison,

24 picking up money at the direction of Mr. Allison, turning money

25 over to Mr. Allison, and so on.  And that falls right within

the factors that are set out in 3B1.1 and particularly in the
application notes.

The decision-making authority with regard to those
transactions was done -- at least according to the
co-conspirators, was done by Mr. Allison.  Yeah, maybe those
co-conspirators had some side deals going on, too.  That begs
the question of whether or not other things that they were
doing were at the direction of the decisions -- the direction
of Mr. Allison based on his decision-making and, again, the
nature of the participation in the commission of the offense.

The co-conspirators are saying that Mr. Allison was
directing the portions of the conspiracy that he was involved
in, the recruitment of accomplices.  Again, the perfect example
there of Mr. Downs.  Mr. Downs was brought into the conspiracy,
according to Mr. Downs, by Mr. Allison.

So just going down the factors that are set out right in
the guideline book, it seems that the enhancement as applied in
the presentence report falls squarely within that particular
provision and that, therefore, the objection is overruled.

I believe the last of the objections that hasn't been
withdrawn has to do with there being no credit for acceptance
of responsibility.  And with that, Mr. Thomas, I'll turn to
you.  And particularly there what I want to focus on is what is
set forth in the Government's departure motion because some of
the factors that are set forth there -- in explaining all the

1  facts and circumstances regarding the defendant's actions that
2  are set out in that motion, there are a number of things,
3  including seeking to have perjured testimony when this hearing
4  was previously scheduled, when he had prior counsel, the denial
5  of so many substantial elements of his participation.

6      Once again, isn't this exactly what the loss of acceptance
7  of responsibility is all about under the guidelines?  So having
8  said that, explain to me how this -- this set of circumstances
9  gives rise to acceptance of responsibility.

10         MR. THOMAS:  Your Honor, again, as the Court knows,
11 Mr. Banks and I inherited this case, and certain things had
12 been done when we came into it.

13     What I will tell you is that the first -- when we talk
14 about -- I think the Court characterized it as the denial of so
15 many aspects of or elements of this matter that would seem to
16 be arguably uncontradicted.  I won't concede that, but arguably
17 uncontradicted.

18     Those things were first -- and I met with Mr. Allison, had
19 a conversations with him, Mr. Banks has met with him.  All
20 those things were done in good faith based on, certainly,
21 Mr. Allison's understanding of certain aspects of his case.
22 That's not the end of the story.  The end of the story is he
23 was represented by counsel, and so they were done in good faith
24 with counsel, who said these things we can contest.

25         THE COURT:  Let me stop you because I want to make

1   sure I understand your argument because I want to give

2   Mr. Allison a completely fair shake.  But where you say these

3   things are done in good faith because he had been advised that

4   these were elements that could be contested, just because an

5   element can be contested doesn't mean that it is something

6   about which you can suborn perjury.  It isn't something about

7   which you can present false testimony.  If it can be

8   legitimately contested, it would be based on the fact that

9   evidence, truthful evidence, that you have runs counter to what

10  the Government is asserting.

11          MR. THOMAS:  I appreciate --

12          THE COURT:  And how is doing it differently something

13  that's done in good faith?

14          MR. THOMAS:  Sure.  Your Honor, I'm not avoiding the

15  Court's question.  I understand and clearly have read with

16  great interest Mr. Kent's sentencing memorandum.  And quite

17  frankly, I can't speak to a lot of things that occurred before

18  my involvement in this particular case.

19      Certainly, as defense counsel, I can't sit here and

20  concede that all of the factual averments that Mr. Kent has

21  made are actually true with regard to him attempting to suborn

22  perjury.  I wasn't involved in that aspect of the case.

23      What I can tell the Court is this, that since Mr. Banks

24  and I have come onboard in this case, we have looked at the

25  case.  We understand -- and I am not suggesting that I don't

1 understand the Court's concern.  What I am suggesting is that

2 we have gone to great lengths to the extent that there were --

3 and I'll use some air quotes here -- issues to address those

4 and have tried to move forward.

5 Mr. Allison is not here today -- there's a sea change, I

6 think, from where we were six months ago to where we were

7 today.  I think, and what I would ask the Court to consider, is

8 we've gotten to a place to the extent that there was an

9 argument before that acceptance of responsibility did not

10 apply.

11 We have gotten to a different place today, and I'm going

12 to ask the -- and you'll hear some more about this as we talk

13 about what's an appropriate sentence and variance and things

14 like that.  We've gotten to a place where, if there was a

15 question about acceptance of responsibility, that there should

16 not be one today.

17 THE COURT:  Well, let me ask you this because I think

18 this is what you just touched on, because if -- if the

19 defendant post-arrest, even post-plea, does something that

20 manifests a failure to accept responsibility, under the

21 guidelines at that point the defendant loses acceptance, loses

22 the three points.

23 Now, the defendant might do something thereafter to

24 rehabilitate his position, but that's a question of a variance,

25 isn't it?  That's not a question of whether or not, in

1  calculating the guideline range, that he can somehow undo what

2  he had done in order to lose acceptance of responsibility.  Is

3  that your understanding of how we navigate the guidelines?

4        MR. THOMAS:  Certainly I'm not trying to avoid

5  answering the Court's question.  Let me hopefully answer it

6  this way.

7        I could certainly understand, under those facts, a court

8  not awarding an acceptance of responsibility.  I can understand

9  that.  I'm not going to -- it's never been my practice, in

10 30 years of practicing law, to come in here and make up law,

11 although sometimes, sitting on this side of the table, I'd like

12 to do that.  I understand the Court's position.

13       THE COURT:  Well, it's not so much a position.  I'm

14 just saying do you disagree --

15       MR. THOMAS:  I respect what the Court is articulating.

16       THE COURT:  Okay.

17       MR. THOMAS:  Let me say this with regards to the

18 allegation that perjury was suborned because I can't concede

19 that here today.  I've been practicing for 30 years in federal

20 courts, primarily in Atlanta, you know, and other places in the

21 southeast.  Mr. Banks, same thing.

22      Certain things -- I have never tendered to the Court a

23 witness who I believed, based upon my factual investigation --

24 which I think is the duty of every attorney -- a client -- a

25 witness that would testify to facts that were false.

1     So I'm going to fall back on -- and I hope the Court
2  understands what I'm saying, that the objections that were made
3  to the presentence report prior to Mr. Banks arriving --
4  Mr. Banks and I arriving in this case were done after
5  consultation with Mr. Allison and in conjunction with counsel.
6  I'm going to ask the Court to again consider that.  Again, I am
7  going to be very clear for the record that I am not conceding
8  Mr. Allison or anybody else attempted to suborn perjury.
9     And I think that, based on all of the things that have
10 occurred in this case, based on where we are today, Mr. Allison
11 has withdrawn the objections that I -- I clearly think would
12 have warranted -- without question would have warranted a
13 denial of acceptance of responsibility.
14     We've -- there were objections -- I mean, there were --
15 there were facts that were agreed to between Mr. Allison's
16 prior counsel and Mr. Kent, facts that were discussed in court
17 with the -- with the -- I believe another judicial officer that
18 were agreed to, and then there were objections filed as to
19 that.
20     I think, had those been allowed to stand and to go
21 forward, if we were sitting here arguing about, you know,
22 Mr. Allison should be at, you know, a Level 100, you know, he
23 should be at 102 months because he didn't do all that stuff,
24 clearly, without a doubt, if we had gone forward on those
25 objections, I would better appreciate and understand the

1  Court's position that that would not warrant an adjustment for
2  acceptance of responsibility.

3      Clearly, with regards to the obstruction issue, when we
4  agree to facts that are inconsistent with what was done in a
5  previous proceeding -- we didn't really have a basis to come
6  here today and stand here and argue to the Court that there
7  should not be an adjustment for obstruction.  If we had gone
8  forward in that regard, I think that's a clear line -- clearly,
9  we would -- Mr. -- I would have a difficult time standing here
10 and arguing that Mr. Allison would be entitled to acceptance if
11 those were the facts.

12     Those other things that occurred with the consultation of
13 counsel and, in large part, because of those objections that we
14 discussed that I've withdrawn, because they were offered, then
15 it was necessary to have or potentially have these hearings.
16 Had that not happened -- and again, those are all decisions
17 that are made by people to assist Mr. Allison through this
18 process.

19     Again, I'm asking the Court -- I appreciate the Court's
20 commentary and suggestion, but I'm asking the Court again,
21 based on where we are today, those objections don't exist
22 anymore.  Had they not existed in the first place, we wouldn't
23 be having this conversation.  I think Mr. Allison better
24 understands that, and I'm asking, based on where we are today,
25 to award Mr. Allison the adjustment for acceptance of

responsibility.

THE COURT: Well, and you keep referring to "where we are today," and that goes to the question that -- I'm trying to get an answer from you, and I'm not sure I've heard it yet. And I apologize if I sound like some sort of frustrated old law professor or something, but --

MR. THOMAS: And I apologize if you feel like I'm equivocating. I'm not trying to do that, so I apologize, as well.

THE COURT: In the situation -- which I have seen many different flavors of this one. The defendant does something unlawful, gets arrested, burns the evidence, does something of an obstructive nature. Then, after talking to his attorney, he realizes, oh, that was a big mistake. And then he is -- goes before the Court, he pleads guilty, he says, yes, I did it.

And at that point -- I've seen that in various forms and that is an enhancement for obstruction, but a deduction for acceptance of responsibility because, by the time he comes before the Court, he recognizes the error and, therefore, accepts responsibility for it.

As I understand the facts of this case -- well, let's not even talk about this case yet. Let's talk about what the law is. But if you have that same thing, where you have the defendant commits some transgression, burns the evidence -- therefore, he is going to get an obstruction enhancement -- he

comes before the Court, he pleads guilty, but then, after

pleading guilty, he denies relevant conduct -- he's saying, oh,

yeah, I -- I admit that I did X, but I didn't do A, B, C, and

D, which are all in the relevant conduct -- under those

circumstances, the defendant gets the enhancement for

obstruction and doesn't get a deduction for acceptance of

responsibility.

Even if that defendant thereafter, prior to sentencing,

shows up at sentencing and says, yeah, I've seen the error of

my ways, and, yeah, I admit I did A, B, C, and D, he still

doesn't get acceptance of responsibility because he put the

Government to the task of having to buttress everything

regarding A, B, C, and D.

It seems to me that that third scenario that I just

described sounds like what you're trying to describe here by

saying, but as we stand here today, Mr. Allison should get

acceptance of responsibility.  But it sounds like you're

describing that third scenario, which, under the law, I don't

understand that he would.

So I want to give you another chance.  Is my expression of

the law incorrect or am I misunderstanding the factual argument

that you're making?

MR. THOMAS:  I think you're expressing the law as

correct.  I disagree, I think, with the factual analysis of

where we are.  And perhaps I have not been clear.  I don't mean

that because of where we are today, that stuff should be
ignored.  I think -- that stuff happened.

And again, let me be very clear.  I am not misleading, and
those witnesses didn't take -- the witnesses didn't take the
stand and hear it didn't happen.  I am not conceding to those
facts.  I don't know what those witnesses would have said.
There's no testimony about -- there's nothing in the record
about that, so I'm not conceding that there was a subornation
of perjury.

I don't know if those people -- if the facts are correct
with what Mr. Kent said.  I don't know if those people -- if
they were going to come in here and testify factually correct
that Mr. Allison had anything to do with it.  I just don't
know.  And so I don't think that there's a sufficient -- first,
with respect to that, a sufficient, factual record with regards
to that, those particular facts that he's alleged.

What I am saying is that if I, as counsel, or anybody else
as counsel, agrees to a set of facts in a factual basis and
comes back later as counsel and says, yeah, that stuff didn't
happen, my argument is simply this:  That is not all on
Mr. Allison.  That's my argument.

Mr. Allison didn't take the stand at a previous hearing
and say I didn't do that.  It just didn't happen.  And so when
I say "where we are today" -- and again, I want to be clear.
Again, I think everybody knows now we weren't involved in that

1  process.

2        THE COURT: Okay. I need to get clarification from

3  you, though, because you say Mr. Allison didn't take the stand

4  and testify to that. However, what he did do -- and it's

5  expressed in the record -- is he came to be interviewed by --

6  he came to debrief with Government officials and with

7  investigators. And it was within that context in which he

8  denied various elements of his offense conduct. That's -- as

9  far as acceptance of responsibility is concerned, that's just

10  as serious, isn't it?

11        MR. THOMAS: That's actually, I think, a little bit

12  easier for me to address, right? In the plea agreement,

13  counsel specifically carved out -- I mean, the agreement

14  between the parties is he could specifically carve out certain

15  aspects of the relevant conduct.

16     That -- I think what the Court just described is not

17  uncommon. I mean, that happens every day. Yeah, we did five

18  kilos, but that other transaction I didn't have anything to do

19  with. I'm just -- you know, I'm not citing to a specific

20  factual scenario in this case.

21     That is, again, not uncommon at all, that in those types

22  of interviews -- of which I participated in hundreds, if not

23  thousands -- where the defendant says, yeah, I did that, yeah,

24  you got me, yeah, I'm a drug dealer, but, when they say I did

25  X, Y, and Z, I didn't do that.

1    THE COURT:  Okay.  Let's be a little bit more
2  specific.  We're talking in a vacuum.

3    Specifically, just looking here, one of the things that
4  comes to mind -- and I'll use it as an example -- where, in the
5  debrief, Mr. Allison says that he -- well, he denied ever being
6  involved in any transactions that involved Mr. Downs.
7  Mr. Downs comes back ultimately and says that's not true,
8  there's no -- no bit of that that's true, because Mr. Downs
9  admitted to all sorts of very specific conduct that he did, not
10  only with Mr. Allison, but on behalf of Mr. Allison.

11    There it was not something where, in the plea agreement,
12  Mr. Allison said, yes, I admit X and Y, but I deny A, B, and C
13  because I didn't do it, and then there's no evidence that A, B,
14  and C happened.  Here A, B, and C involved Mr. Downs, and
15  Mr. Downs said, yeah, it happened, yeah, I did that, and, yeah,
16  I did that with Mr. Allison and for Mr. Allison.  But yet
17  Mr. Allison denied it in the debrief.

18    Isn't that a perfect example of a failure to accept
19  responsibility?

20    MR. THOMAS:  As a practical matter -- and I'll talk
21  about the legal -- those types of situations are not uncommon,
22  where there is a factual dispute about what happened.

23    Now, I'll be honest with you, Judge.  I'm not today -- I
24  won't spend the time to look for it, but when that occurred,
25  when that conversation occurred -- but the -- but where we are

1   -- I hesitate to say this anymore.  Where we are now is that
2   he's come to court and said I agree with the determinations
3   with respect to relevant conduct that I agreed to.  So he's
4   agreed to that.

5       And this is not -- and I heard everything the Court just
6   said, but that's not a denial of relevant conduct.  That is not
7   a denial of him coming to court and saying, yes, I am a drug
8   dealer, yes, I did these amounts, yes, I did things with other
9   people.

10      I just -- as a practical matter, those were situations
11  that occur all the time, and that's -- that was even
12  recognized -- I'm not saying Mr. Kent agrees with it, but that
13  was even recognized in the negotiations with the parties where
14  they said, look, I'm not going to -- I won't agree that you're
15  going to prove these amounts, these drug amounts that are going
16  to trigger certain mandatory minimums and going to trigger
17  certain offense levels.  I agree to that.  How all that
18  happened, I'm not agreeing to that.  So we carve that out --

19          THE COURT:  There's a difference between not agreeing
20  to it and affirmatively saying something contrary.  One is
21  saying to the Government prove your case; the other one is
22  saying the facts here are different.  One is a false statement,
23  and the other one is not.

24          MR. THOMAS:  We've never gotten to the point with
25  respect to that, where we've said -- I mean, give -- given

his -- given his withdrawal of those objections, we've never gotten to the point where we said to Mr. Kent prove your case. We've come in, we waved the white flag, and said we did these things.  We did these things.

And I agree, the mechanics of them are -- certain mechanics are important in terms of how those things were done, but that's not a denial -- I mean, that's not I am denying acceptance of responsibility.  That's just not -- I don't agree that that warrants a -- not giving Mr. Allison acceptance of responsibility, particularly if these things were done in anticipation of the plea agreement or in the run up to the plea agreement, to the extent that they were done with counsel there, with the advice of counsel about his understanding at the time of the facts.

That's not -- I just don't -- I can't agree that that is -- warrants a denial of an adjustment for acceptance of responsibility.

THE COURT:  Okay.  Anything else on that point?

MR. THOMAS:  Judge, I think I'm done.

THE COURT:  Okay.  Mr. Kent.

MR. KENT:  Your Honor, I think two of the most difficult issues in this case for the Government were acceptance, as well as the 5K.  I think in some ways they're really intertwined.  As a prosecutor, I think what Mr. Thomas was talking about was, especially in drug cases, conduct folks

will admit to, whether it's in their case or their debriefs,
oftentimes also become intertwined.

And cooperation is a process. We call it pulling teeth.
We tell defendants, don't make me into a dentist, I don't want
to pull your teeth. Maybe your codefendants are going to get
to the table quicker, and they're just going to give up to the
information, which we then can corroborate.

Sometimes that is because folks are -- it's IQ level, it's
education, it's been in the street too long, been in and out of
the system too much, they're -- oftentimes they're in denial.
Other folks are used to being in charge, which I would submit
is the defendant's case.

So they can't help to try to -- and I'm not saying this
goes against acceptance, but the phrase I would use is game the
system, you know, not just openly admit things to the DA, see
what the DA can prove, and what they can and can't get away
with.

And through the 5K, you sort of see the tortured process
of that happening and to the point where I said now he's done
something -- which I'll speak on in a moment -- that I believe
is rehabilitative. I think that's what you were asking about
earlier.

That being said, there was a sea change in the sense that
a number of objections, serious objections, were withdrawn, and
the defendant now is openly admitting much of the conduct that

forms the basis of his involvement in the conspiracy.  And

certainly the Government, regardless of being put to the task

of doing 70-page responses and things like that, is

appreciative of.

In addition, although, again, it was sort of a tortured

path to get there, the reason -- and we can discuss this

shortly, but the main reason I did the 5K is because of his

post-April 2020 -- which was when this was previously set --

cooperation, which was very significant, in Swain County

detention center.

For me, with my experience with Mr. Allison, that was a

big sort of break.  Certainly I appreciated withdrawing

objections and shortening this hearing, but that cooperation

with prosecution was a big break with what had happened, who he

had been before.  So I view that as a rehabilitative thing.

So I know it's sort of possibly a tortured argument.  I

understand the scenarios your Honor was bringing.  Oftentimes I

may have even sat here asking that defendants do get

acceptance.  And this case is probably, for most, would say too

far of a push.  And with the exception of that rehabilitative

cooperation, I would probably be in that boat, as well, saying

don't give it to him.

But that is something that changed since the filing of my

response, so I'd ask you to take that into account, and I'll

leave it to your Honor's discretion as to whether or not to

1  grant acceptance, but I would ask you to seriously consider

2  that cooperation, your Honor.

3        THE COURT:  Well, and -- and let me start throwing

4  some of the questions to you that I was throwing to Mr. Thomas,

5  and that is this whole concept of rehabilitative acceptance.

6        Is your understanding of the law that, where a defendant

7  post-plea has done something -- whether it's in a debrief or

8  with regard to physical evidence destruction, whatever -- does

9  something that manifests a lack of acceptance of

10  responsibility -- and not to say that this scenario applies

11  here, but, as you called it, gaming the system -- and we've

12  seen many defendants of this nature, both you and I have --

13  gaming the system, can the defendant get away with these things

14  in order to minimize the sentence?  And then when it doesn't

15  work, it's sort of like, okay, I surrender.

16        Does that defendant get acceptance of responsibility?  And

17  the answer is -- almost across the board or across the board,

18  the answer is no.  It's really hard to rehabilitate a complete

19  failure of acceptance of responsibility when the defendant

20  failed to accept responsibility post-plea.

21        It sounds to me like you're saying, but there are

22  exceptions.  And maybe there are, but what are the parameters

23  of an exception there, and how does Mr. Allison fit into those

24  parameters?

25        MR. KENT:  So I agree with your analysis of the law.

1  I would usually be the person that would just say at that

2  point, as I did in my response, enough is enough, I cannot

3  support your request for acceptance of responsibility.  Too

4  much has happened, too much water has come under this

5  particular bridge.  It's no longer stable.

6      And I'm -- I would say, as early as the recent -- a week

7  ago I still wasn't sure I was going to do the 5K in this case

8  because of all these incidents that had taken place and that I

9  have to get up here, as an officer of the court, as a

10  representative of the United States Government, and say whether

11  or not I believe this was good enough.

12      How do you ask for a 5K -- and it's obviously going to

13  affect acceptance of responsibility at a time when -- can you

14  say the defendant has been totally honest?  Can you say he's

15  been completely timely?  And I address those issues in there.

16      I have never had a circumstance where a defendant has then

17  done something -- really, unrelated to the Government --

18  reported a serious crime where people could have got hurt after

19  all of that water under the bridge.  And that was really,

20  again, the key for me.

21      So I'm not sure what the parameters would be.  I have to

22  imagine there are going to be circumstances -- well, this is

23  the first time I've ever had this.  Somewhere in the country,

24  where someone is going to do such a bad job at acceptance, that

25  there's no argument that they in any way accepted

responsibility, but then something happens that demonstrates a change. And I think you oftentimes refer to it, your Honor, as either a rehabilitative effort or something that marks them beginning to move down the path of the straight and narrow.

And I'm not saying I have a tremendous amount of confidence that Mr. Allison will stay on that path. I'm going to be asking for a very significant sentence that will probably keep him from getting on that path for quite some time. But this was such a break. I was shocked when the officers called me to say who had reported this and that he was cooperative.

So I'm not sure what those parameters are, and that's why I can't stand here today and say he's overcome all his issues with acceptance, but I also can't ignore the fact that he began to go down a different path, which was very different from everything I have ever encountered from this defendant during the course of this case. And I'll leave it at that, your Honor.

THE COURT: Well, here's the problem that I'm having. And maybe if I take long enough, you and Mr. Thomas will convince me that the law is a little bit different than what I thought it was.

Where you have a defendant who does something that is contrary to accepting responsibility -- as you called it, gaming the system -- if a defendant simply comes back and realizes, oh, that didn't work, my bad, I repent, yeah, I --

I'll admit it now, if that gets -- if that gets that
hypothetical defendant acceptance of responsibility, then the
law encourages gaming the system and, therefore, I know that's
not the law.

MR. KENT:  Correct, your Honor, and I'm not advocating
that it is.  Again, I've always looked at it as you don't just
get to come in and say, oh, sorry.  And so like the robber who
said, well, I gave the little old lady her purse back, so we're
even -- like, no, the problem is the action you took prior to
this attempt to rehabilitation.

THE COURT:  But it seems to me, if there is some sort
of opportunity of rehabilitation, of acceptance of
responsibility, that that rehabilitative act has to
substantially outweigh whatever it was that occurred post-plea
that the defendant did or said that caused him to lose
acceptance of responsibility.

I don't know that I have ever had a case in which I have
had to weigh what is that rehabilitative act.  I'm having a
conceptual problem with that rehabilitative act being something
that's completely unrelated to this case.  How do you measure
those?  I mean, to use the worn-out cliche, isn't it apples and
oranges?  It doesn't pertain to what was done here that would
have caused the loss of acceptance of responsibility.

MR. KENT:  And I agree, your Honor.  I'm not here
advocating you now go ahead and give him acceptance from saying

1  it's -- I'm having the same difficulty.  I would be asking that

2  you consider that as hopefully him turning on the right path.

3      I know in the past, when you've talked to defendants about

4  hopefully getting on that path, for most defendants it is a

5  matter of completely turning their back on what they had done,

6  pleading guilty, admitting their responsibility, showing up at

7  sentencing, being ready to go forward, and not playing games,

8  not gaming the system.

9      So compared to those defendants, I supported not giving

10 him acceptance of responsibly.  And heading into that

11 sentencing hearing, there were additional things that happened

12 right up to that sentencing hearing that I believe went against

13 giving him an acceptance of responsibility.

14     So all that -- the only position I'm taking is I'm asking

15 you to consider what he did.  I understand that it is not

16 related to this offense.  There is a very good argument that it

17 is not substantial enough to outweigh all the things he did

18 that went towards denying his acceptance of responsibility.

19 I'm just asking this Court -- for me, what he did just was sort

20 of a light-going-off moment.  It was a significant change in

21 position or change in path from the usual dealings I've had

22 with the defendant in this particular case.

23     I don't know if that's enough to get past because I've

24 never in my career had so many incidents, let alone these types

25 of incidents, that go against acceptance of responsibility.

Occasionally it's, you know, I pled and I -- before I went into custody, I used drugs. You know, there's an argument that's a denial, but there's an argument that it's not.

And occasionally I've had defendants for far less -- Mr. Wright in this case cooperated also against Mr. Chavez, and Mr. Chavez continued to conspire to deal drugs while in custody, committing the same type of offence. That was one thing, a serious thing, but one thing significant enough to deny acceptance of responsibility.

I understand, and I've argued there are multiple things that are a basis to denying acceptance of responsibility in this case, but I just want to point out that he does have something on the positive side of the ledger. And unfortunately, this is a new circumstance for me, a new experience. I'm not here arguing, and I'm not even sure that this is enough to outweigh what he has done in the past, your Honor.

THE COURT: Okay. Mr. Thomas, let me turn back to you on this because, the further we wade into this, the clearer it becomes to me that either this is a rehabilitative act that is insufficient to earn the reduction for acceptance of responsibility, but may be a factor for a downward variance as an -- it's not an imperfect departure, but an imperfect application of that provision, or it is enough to warrant a three-level reduction with the proviso that, since the light's

1  on or the light's off -- either he gets three levels down or he

2  doesn't and that this somehow falls somewhere in between, that

3  the defendant would get the three-level deduction subject to

4  the argument that, you know, his rehabilitative act really

5  wasn't worth all three points.

6      Which of -- which of these is this, why, and why should I

7  accept that?

8          MR. THOMAS:  So can I preview my argument to the Court

9  depending on the Court's finding on this issue?  If the Court

10 were to deny -- and I think it should, I feel that very

11 strongly, probably a little bit more strongly than I've felt

12 some of the other arguments I've made today.  If the Court were

13 to deny the adjustment for acceptance of responsibility, in

14 five minutes absolutely I will be making the argument that a

15 departure pursuant to 5K and to the variance issue as to 3553

16 should be substantially more than the Government has asked for.

17 I will absolutely be making that argument in short order.

18     If I could -- I hope that answers the question.  If I

19 could just address a couple other things that the Court has

20 said.

21     I don't think -- these facts warrant -- and just like

22 Mr. Kent said, there are instances where people do things --

23 the use of marijuana prior to -- after pleading guilty, you can

24 get acceptance snatched for that.  I've never seen it happen,

25 although it happens, the use of -- you know, people who have

1 problems use drugs, and there's a lot more stress after you

2 plead.  It -- you could absolutely do that, and it doesn't

3 happen.

4      This is my argument in this case, Judge.  And I'm not -- I

5 want to be clear I'm kind of cutting out the subornation of

6 perjury, the allegation that that occurred.

7      It seems like we're focused on is what actually, factually

8 happened in this case that there's no dispute about, and that

9 is that a sentencing memorandum was filed that was inconsistent

10 with what Mr. Allison came into court and pled guilty to.

11 That -- everybody agrees that happened, that was a de -- I

12 mean, that was a denial of certain aspects of relevant conduct.

13 It would have changed -- there was a sea change from what was

14 contemplated by the parties.

15      My argument is this.  Defense attorneys do what defense

16 attorneys do, and I'm a defense attorney.  That -- that -- a

17 denial of acceptance of responsibility for Mr. Allison is not

18 warranted where counsel takes a legal -- a legal position with

19 respect to relevant conduct that is not consistent with the

20 agreement of the parties.  And then -- and then, when the

21 consequences of that are explained, and there's a conversation

22 about, well, you know, this is what that means, and then a

23 decision is made, well, we'll withdraw that stuff if it's

24 wrong.

25      But when counsel makes a -- what they believe to be a

legally meritorious argument, it is wrong to punish this

defendant with the acceptance of responsibility.  Now, the

Court --

THE COURT:  I need to stop you because I'm not talking

about anything where his prior attorney may have misunderstood

what the facts are and, therefore, filed a sentencing -- the

original sentencing memorandum with things that are incorrect.

I'm not talking about that.  I'm talking about the things that

are in the record about debriefs, denial of relevant conduct by

Mr. Allison, not in some sentencing memorandum.

Mr. Allison isn't going to be penalized for his prior

attorney misunderstanding something, just like he's not going

to be penalized if it turns out you misunderstood something.

That's not what I'm talking about.  I'm talking about the

actions and the statements of Mr. Allison, including some of

the things he said that were caught on jail calls.  And

you're -- I'm sure you're well aware of what I'm talking about

there.

MR. THOMAS:  Judge, throughout this process -- and I

appreciate the Court's kind of helping me narrow that.  We're

not talking about a legal position that was taken.  But what

I'm going to, again, reiterate to the Court is there were

certain carve-outs and understandings in advance of Mr. Allison

coming to court about these things that we're just not going to

agree on.

1    Throughout this entire process Mr. Allison was guided, had

2  the advice of counsel, and took these positions and did these

3  things in these debriefings.  And this is not a situation

4  where -- because the Court used this term, and I want to talk

5  about the term you used.

6    When it doesn't work -- this has never been a situation

7  where we got to a point where it didn't work.  We got to a

8  point where people came in, reviewed everything that had

9  happened in this case, and said this is not a -- we're not in a

10 place that's legally viable.

11   And so I do think that is consistent with acceptance of

12 responsibility.  I mean, all the time attorneys, you know,

13 counsel with the client, they develop further facts, and they

14 say, you know, we need to withdraw this objection and move

15 forward.

16   We talked about -- the other term I heard was actions

17 which substantially outweigh kind of what took place that would

18 warrant acceptance of responsibility.  I don't think there are

19 any cases that talk about that, but we'll just talk about that

20 for a minute.

21   What I would suggest -- if there's where we're kind of

22 looking, about something that substantially outweighs,

23 Mr. Allison -- and understanding the state of the record six

24 months ago, came in and, through counsel, authorized us to

25 withdraw these objections.  And I think that's indicative of

acceptance of responsibility.

And I'm not standing here saying, you know, Mr. Allison had done some things -- and, you know, he's going to pay the price for that. But that is not -- that doesn't warrant the denial of acceptance when we finally get to the sentencing hearing, when we prepare, when we've had meetings with him and conversations about things that have taken place, and say that's not -- you're not going to prevail on that issue.

That's not -- so it's not -- I don't think it's a situation where it didn't work, where he's on the stand and going, yeah, you know, I didn't sell all that dope, I didn't do this, I didn't do that. He's putting the Government to its test, to its burden, and we listen to five or six witnesses who go, yep, that's what happened, that's what happened, that's what happened. And then we stand up at the sentencing hearing and go, you know what, Judge, yeah, it didn't work, we need to get acceptance of responsibility. That's not the facts here.

The facts here -- we walked in today, we've had conversations with Mr. Kent about where we were on this. And I understand that's not dispositive for the Court and, clearly, Mr. Kent didn't agree to anything. I wish he had. We talked about that, but that's not what happened.

What happened is that, very simply -- and I'll sit down -- Mr. Allison has accepted responsibility for his conduct in this particular case, and he should get the adjustment.

1  Obviously -- I hope we'll be addressing his substantial

2  assistance in a minute, and at some point the Court will make a

3  determination as to what is an appropriate, a reasonable

4  sentence that should be imposed.

5       I think that all of these factors can be -- should the

6  Court still have lingering concerns about all of those things

7  that have taken place up till today, the Court can factor those

8  in.  But in terms of whether the adjustment applies for

9  acceptance of responsibility, I believe it should apply.

10            THE COURT:  Okay.  Anything else?

11            MR. THOMAS:  No, your Honor.

12            THE COURT:  Well, with regard to this objection as to

13  whether or not the defendant is entitled to a reduction for

14  acceptance of responsibility, I find this to be a particularly

15  difficult question in applying section 3E1.1 because, as it

16  says right in the application notes, if a defendant falsely

17  denies or frivolously contests relevant conduct that the Court

18  determines to be true, that defendant has acted in a manner

19  inconsistent with acceptance of responsibility.

20       And the particular things in the record -- not referring

21  to some statement by counsel, but particularly some of the

22  things that are set forth in the Government's motion -- would

23  seem to fall within that.  However a different part of the

24  application, though, does refer to a factor of the post-offense

25  rehabilitative efforts of the defendant -- even though that's

in a somewhat different context -- and the timeliness of the
defendant's conduct in manifesting the acceptance of the
responsibility.

That tells me, much like what Mr. Kent has argued here --
and Mr. Thomas has argued, as well, from a somewhat different
angle -- that the things that I am focusing on as constituting
a denial of acceptance of responsibility are subject to actions
by the defendant rehabilitating that wrongful course of action.
It's complicated somewhat by, here, the rehabilitative course
of action being completely unrelated to this case.

I'm also troubled by the fact that it is clear to me that
any such rehabilitative action must substantially outweigh what
the action was that manifested in a denial of acceptance of
responsibility; otherwise, this Court would be encouraging
every defendant to try to avoid responsibility and then come
back at a later time to accept responsibility.  And that
undermines the entire guideline system.  However, 3E1.1 is
clear in that, unlike in other provisions, where there's some
middle ground, either the reduction for acceptance of
responsibility is granted or it's not.

And, therefore, what I will do is I will sustain the
objection, I will grant acceptance of responsibility, but I
will do it with the proviso that that is without prejudice to
an argument or a finding that the rehabilitative action on the
part of the defendant would not necessarily have been

1  sufficient to have earned all three points.  And that needs to

2  be taken into account with regard the 3553(a) factors.

3      Having said that, Mr. Kent, obviously, under 3E1.1(b) of

4  the third point of acceptance of responsibility is within the

5  control of the Government with -- in light of the Court having

6  found acceptance of responsibility.  So what says the

7  Government with regard to the additional point?

8      MR. KENT:  Your Honor, I would movie that the

9  defendant be given that additional point.

10     THE COURT:  With that, then, the three-level reduction

11  for acceptance will be allowed.

12     Are there any other issues regarding the offense level or

13  the calculation of the guideline range that we need to address?

14  Anything for the defendant?

15     MR. THOMAS:  Your Honor, Mr. Kent and I had a

16  conversation.  There's some discussion in the presentence

17  report about Mr. Allison being a career offender, and my

18  sentencing memo doesn't address this, and I don't think his

19  does.

20     I think it's the Government's position that the career

21  offender does not apply because of a change in the law, so I

22  guess I'll take some direction from Mr. Kent if that's their

23  position.

24     And I guess, just for the record, to the extent that the

25  probation report does identify Mr. Allison as a career

offender, I'd just ask the Court to entertain, without any
further argument, just our -- perhaps an untimely objection to
that given my conversations with Mr. Kent.

THE COURT:  Well, Mr. Kent, what do you say about
that?

MR. KENT:  Given the findings of the Court so far with
regard to the application of the drug quantities, the
enhancements, your Honor, it's my anticipation that the
argument's moot to the extent that that base offense level
would be higher than the base offense level under the career
offender guideline.  And if it did get -- even if it was at
play, and it's not -- because it's not at play, there's no
reason to reach whether or not conspiracy counts as a
controlled substance, if that's anymore under the guidelines,
your Honor.

THE COURT:  Well, with regard to the issue of whether
or not the defendant is designated as a career offender, first
of all, I will note that it does appear that, in the
presentence report, that the defendant has sufficient
predicates to be counted as a career offender; however, the
calculation of the offense level on pages 26 and 27 of the
presentence report do not identify the defendant as a career
offender.

My understanding of current case law is, without the
designation of the defendant as a career offender, with the

1 presentation and statement of what the predicate offenses are,

2 that the defendant cannot be sentenced as a career offender.

3     I will note that adjusted offense level, as calculated in

4 the presentence report and as found by the Court, is still at

5 43. If the defendant had been found to be a career offender,

6 it would have been 37. Therefore, the adjusted offense level

7 being higher than the career offender offense level, the career

8 offender designation became irrelevant to the process.

9     I will note that, if this matter comes back at any point

10 for resentencing, that I would fully expect that the probation

11 office would do a supplemental presentence report that would

12 address the career offender issue if it becomes relevant, but

13 at this time I don't see that it's relevant.

14     MR. THOMAS: That's all as far as the defendant's

15 concerned, your Honor. I agree with all of that.

16     THE COURT: Is there anything else regarding the

17 presentence report that we need to address? Anything from the

18 defendant?

19     MR. THOMAS: May I have just a moment, your Honor?

20     THE COURT: You may.

21     (Discussion off the record.)

22     MR. THOMAS: Thank you, your Honor. We have nothing

23 further to address in that regard.

24     THE COURT: Okay. Mr. Kent, anything else on the

25 presentence report for the Government?

1        MR. KENT:  No, your Honor.  Thank you.

2        THE COURT:  With that, the Court will accept the

3   presentence report as written, with the exception of the

4   objection that was sustained regarding paragraph 102, that the

5   defendant receives the three-level reduction for acceptance of

6   responsibility.

7        Therefore, the Court will find that the total offense

8   level in this matter is Level 40, and the criminal history

9   category is Category 5.  Based on that total offense level and

10  criminal history category, the Court will conclude, as a matter

11  of law, that the guideline range that applies in this case

12  calls for a term of imprisonment between 360 months and a term

13  of life imprisonment.

14       Mr. Thomas, did I calculate that correctly?

15       MR. THOMAS:  Based on the Court's findings, I believe

16  those are the guideline calculations, your Honor.

17       THE COURT:  Do you agree, Mr. Kent?

18       MR. KENT:  Yes, your Honor.

19       THE COURT:  The next thing I want to take up is the

20  Government's motion for a downward departure.

21       Mr. Kent, I'll have to say that I don't believe I have

22  ever seen a 21-page motion for downward departure before.  Is

23  there anything that you want to say in supplement to what you

24  have had me read?

25       MR. KENT:  No, your Honor.  I apologize for the

1 length. Again, it was a reflection of a tortured path we've

2 taken to get here today. But I have nothing further unless you

3 want me to answer some questions, your Honor.

4 THE COURT: Well, the length of that motion is only

5 indicative of the length of the substance.

6 Mr. Thomas, do you want to say anything with regard to the

7 Government's motion?

8 MR. THOMAS: Your Honor, you have -- I'd ask the Court

9 first to grant it. I do want to -- and I don't know if this is

10 the proper time to address the extent of that departure. I

11 don't know if the Court wants to -- different courts do it

12 differently with respect to if we want to argue for the

13 sentencing -- the appropriate sentence at this time. I'll just

14 take some direction from the Court with regards to that.

15 THE COURT: Well, to the extent you want to argue

16 anything that has to do with the motion within the confines of

17 5K1.1, now is your opportunity to do it.

18 MR. THOMAS: Thank you, your Honor.

19 THE COURT: Now, some of those things you may want to

20 defer to an argument regarding sentencing in the form of a

21 variance, rather than on a departure, but I leave that to your

22 discretion as to where you want to say those things.

23 MR. THOMAS: Thank you, your Honor.

24 Let me just talk a little bit about my view of

25 Mr. Allison's cooperation. And I apologize in advance if the

1    Court hears this again briefly when we talk about a reasonable
2    sentence.

3        Your Honor, we have talked at length today about the
4    challenges that this case has presented, I think both for
5    Mr. Kent, for us, and obviously for the Court. What happened
6    on this particular day, again, I think is indicative, first, of
7    where Mr. Allison is now today. He had made some efforts to
8    cooperate again when Mr. Banks and I came onboard. We had been
9    working with him on that.

10       And I've been doing this -- I think I referenced it --
11   about 30 years now as an attorney, first as a state prosecutor
12   with the US attorney's office, been doing this for about 10 or
13   11 years. Prior to that, I was a police officer. I have never
14   seen this type of cooperative efforts and the fruit that it
15   yielded in any of those capacities. And I've sat in several
16   seats and worked with people who have cooperated, and I've
17   never seen this type of cooperation.

18       This is a case where, if Mr. Allison had not done what he
19   did in this case, where the next day or at some point after
20   these individuals had breached the prison, would have -- the
21   news headlines would have said something like guards injured or
22   killed. It would have said inmates injured or killed. It
23   would have said, you know, potentially a riot situation. And
24   Mr. Allison stopped, really, all of that with his efforts in
25   that particular case with regards to the jail situation.

1   He has, as a result of that, had to be moved for his

2 safety.  His family has -- he has received threats with regards

3 to that.  And then, with respect to the other cooperation that

4 he did in this case with respect to a murder, he has received

5 threats with regards to that.

6   And I think this Court has been around long enough to

7 know, Mr. Kent's been around long enough to know, is that these

8 things follow him throughout the time that he is going to be

9 away from his family.  I think that's a factor that the Court

10 should consider, first, in determining whether or not to grant

11 the motion and certainly with determining whether or not to

12 grant the -- to what extent the departure is in this case.

13   As I said, I appreciate that this case has presented

14 certain challenges for all of the parties involved.  I hope

15 Mr. Kent will agree with me that in the recent past, when

16 Mr. Banks and I started working with Mr. Allison, there had

17 been no issues.  There's been some legal things, some of the

18 things attorneys do argue over, certain things and

19 applications.  But there's been no issues with respect to

20 Mr. Allison.

21   He has cooperated.  He's made other efforts to cooperate

22 in this case.  And again, I think that is significant in making

23 a determination as to whether to grant the motion and, again,

24 as to the extent of the motion that the Court -- if the Court

25 grants the particular motion.  I just note that there is the

1 potential for further cooperation.  Obviously, that will be

2 rewarded should that result -- should that bear fruit, but I

3 would ask the Court to grant the motion.

4      I think a departure of more than four levels is

5 appropriate in this case.  I've not, again, seen cooperation

6 that actually kept people from being proactively injured or

7 killed.  And I think, if people are trying to smuggle guns into

8 a jail facility, there's only one reason you do that.  You

9 know, you can't have a gun to protect your cell like, you know,

10 perhaps people could on the outside.  Those guns would have

11 been used -- those weapons would have been used in an offensive

12 manner that's significant.

13      I understand the challenges.  I think a departure greater

14 than four levels in this particular case is appropriate.

15           THE COURT:  Okay.  Well, as I mentioned earlier, the

16 recounting of the information that forms the basis of the

17 Government's motion is more extensive in this case than

18 literally any other such motion I have entertained in all my

19 years I've been doing this.

20      And I will find that, based on the facts that are set out

21 in the motion, that the Court will find, in accordance with

22 what is set forth there and is uncontested, that those facts

23 lead the Court to a finding that the defendant has provided

24 substantial assistance in the investigation of prosecution of

25 other individuals, and that such assistance warrants the

1  granting of a downward departure.

2      The question here is the extent of that downward

3  departure.  And I will start with the fact that the Government

4  has indicated that the downward departure should be four

5  levels.  And I will note that a four-level downward departure

6  is unusual.  A downward departure more than four levels is very

7  unusual, at least for this Court.

8      When I read the Government's motion and all of the facts

9  that give rise to the motion, I was very surprised that the

10 Government was moving for a four-level downward departure

11 because it did not strike me that the totality of the

12 circumstances set forth in the motion warranted four levels.

13 At the same time, defense counsel argues focusing on one

14 particular part that we've been referring to before as the

15 rehabilitative act warrants a departure more than the four

16 levels.

17     So the question is, having determined that a downward

18 departure is warranted, is it a downward departure that, based

19 on the nature and extent of the defendant's actions, warrants a

20 four-level downward departure, a two-level downward departure,

21 or more than a four-level downward departure?

22     And I fall back to what is really my default in these

23 matters, and that is assessing the value of the cooperation or,

24 in this case, hardly the lack of cooperation.  The Court is at

25 a loss for making an adequate assessment because, really, the

1  Government is the party that has the understanding of how much

2  assistance has helped or hindered or how the help and the

3  hindrance work together to come to some sort of conclusion.

4        Based thereon, I will find, in accordance with the

5  Government's motion, that the nature and extent of all of the

6  activity of the defendant as set forth in the Government's

7  motion for downward departure warrants a departure the

8  equivalent of four offense levels.  And, therefore, the Court

9  will sentence in this matter with reference to a sentencing

10 range calling for a term of imprisonment between 292 months and

11 365 months.

12       Mr. Thomas, did I correctly calculate the effect of a

13 four-level downward departure?

14            MR. THOMAS:  Yes, your Honor.

15            THE COURT:  Do you agree, Mr. Kent?

16            MR. KENT:  Yes, your Honor.

17            THE COURT:  Well, Mr. Thomas, let me turn to you.

18 This is obviously a complex case.  We've been at this for two

19 hours.  A lot of facts, a lot of issues.  How do we throw all

20 of these facts and issues into the cauldron under 3553(a) to

21 arrive upon what the appropriate sentence is?

22            MR. THOMAS:  Thank you, Judge.  I'm going to try not

23 to repeat arguments that I've made, although some of that is

24 perhaps inevitable.  I appreciate the Court's indulgence today,

25 and what I'm going to talk about is I'm going to focus on a few

things.

I'm going to focus on what other individuals in this case received, and obviously I'll talk about that first. I don't have the benefit of how their presentence reports looked when they arrived here in court and were sentenced, but, as I noted in my sentencing memorandum, individuals received sentences from between 37 months to 108 months.

I understand that -- so, first, the 3553 speaks to disparities among defendants, and that's defendants, I think, in this courtroom, in this case, and, really, defendants throughout the federal system.

Even taking into account that perhaps Mr. Allison's criminal history is a bit more lengthy -- even if that is the case, and I can't really speak to that because I don't know what those were, the --

THE COURT: Well, I can assure you that his criminal history category, as well as his total offense level, are substantially higher than any codefendant.

MR. THOMAS: Then I'll accept that. And my argument would be, even accepting that, that the disparity that exists between an individual who got 108 months and an individual who potentially faces a low end of 292 months is a significant disparity that this Court should address in fashioning a reasonable sentence.

We have asked for a sentence which obviously would warrant

a substantial variance from where we are.  We believe that's it

warranted.  Again, if the Court were inclined to agree with us

today, the defense today, it would still be a sentence that was

higher than anybody else in this case had received.

And accepting all of the facts that Mr. Kent has proffered

and the Court's ruling against -- rulings in this particular

case, and accepting the Court's factual understanding and

interpretations and legal rulings, that what should happen is

he should get a sentence that's higher than the others.  And

that's what -- even if we agree that -- accept all those things

and if the Court were to grant our motion as written, he would

get a sentence of higher than the other people who were

involved in this.

I think what we have asked for is warranted, again, based

on his -- again, his efforts to date.  And I won't -- you know,

I won't beat that dead horse anymore about where we've come

from the last few months, but that's a fact.  That's what

happened.

3553 talks about the things that this Court has to

consider, the deterrence, the respect for the law enforcement,

the rehabilitative efforts.  Those are all things that

this Court has to consider.  And I suggest to you -- and I

understand -- I think I have alluded to this in my motion, that

that cooperation in 5K considerations are just that.  That's

how a cooperation is rewarded.

1    But I think it is -- there is also a place for
2 consideration with respect to how the Court looks at those
3 factors, how -- the rehabilitation, the respect for law
4 enforcement.  I think what Mr. Allison has done in the past few
5 months and tried to do in the past few months speak to that, so
6 I think a sentence substantially below the low end in this case
7 of 292 months is appropriate.

8    The other thing that I want to address and talk about is
9 really who Mr. Allison is.  As I've pointed out early on in the
10 process, he has family here who he supports.  You know, he's
11 got a range of children from little children up to adult
12 children.  He has worked with and supported and -- you know,
13 they're -- they're a family.  He's never, as I understand, not
14 supported his children.  He does those things.

15    But I want to really talk a little bit more -- I want to
16 begin earlier and talk about who Mr. Allison is.  And I
17 understand -- I have read the presentence report several times,
18 and I understand all of the facts and everything that has been
19 said today.  But I don't think it can be overlooked, the path,
20 if you will, that Mr. Allison has taken to get here.

21    At a very early age, diagnosed as learning disabled.  I'm
22 not an educator, but it appears that that was not perhaps
23 properly addressed.  I don't know.  I just know what he's --
24 how he's been diagnosed.  And the Court, I think, has
25 reviewed -- I won't go into detail about the intellectual and

the cognitive abilities, and there's been really no dispute
with regards to that.

All of that is a part of Mr. Allison.  Raised in the
projects, where limited -- limited options, and then coupled
with the educational backdrop that I just described.  He is
bullied in school in terms of -- I think Mr. Allison used the
term bullied because he rode the short bus at school.  Held
back in the first grade four times.  In the ninth grade, he's
17 years old.

At some point in that process, between first grade and
ninth grade, on one of his tours in first grade, approached by
an individual of 13 to help assist in trafficking his drugs,
where Mr. Allison was rewarded with tennis shoes and fast food.
All of that, I think, is -- are things the Court should
consider in terms of who Mr. Allison is.

He didn't -- and my point with regards to that, Judge, is
he didn't get here by himself.  I will tell you that I have
worked with, again, you know, in my sitting in various seats, a
number of defendants.  And I don't know -- I think there's a
difference between defendants who have opportunities,
defendants who aren't, arguably, educationally disabled, if you
will, and wind up where they are.  There's a difference between
that individual and Mr. Allison.

I understand and won't stand here and say that there's not
going to be, when we adjourn here shortly, a substantial

1  sentence that is warranted in this case because of what -- all

2  of what has occurred.  But I believe that all of the disparity,

3  Mr. Allison's background, that he is -- does seem to be -- and

4  I appreciate Mr. Kent's argument.  I've made similar arguments,

5  that he's not fully convinced that Mr. Allison gets it.  I

6  appreciate and understand that argument.

7      I will say that, within the last six or eight months,

8  we've seen different things start to happen, and the Court

9  should factor that into fashioning, in this particular case,

10 what is a reasonable sentence.  I would suggest that that is

11 not, in this case, a guideline sentence where other defendants

12 received 108 months, even if there is differences in how

13 adjustments will apply.

14     Based on all of that, your Honor, I am going to remain

15 steadfast and ask the Court to impose a sentence of no more

16 than 120 months, which is the mandatory minimum in this

17 particular case with respect to Mr. Allison.

18         THE COURT:  Well, you say 120 months, but you haven't

19 really told me where you come up with that 120 months.  I mean,

20 it is considerably less than half of the low end of the

21 sentencing range after accounting for the defendant's

22 cooperation.

23     I mean, that's a downward variance like -- I don't know

24 that I've ever seen one like that.  I would fully expect, if I

25 impose that sentence, the Government's going to appeal that as

1 an utterly unreasonable sentence under the circumstances of

2 this case.  So you've got to give me more to go on.

3      And if all you're saying is, well, compare it to the

4 108 months of the highest sentence of one of his

5 codefendants -- but his codefendants were the people he was

6 supervising, the people who were working under him within this

7 organization.  Yeah, they may have done some things on their

8 own on the side, but they were working under him.  And to say

9 that, yeah, 12 more months added to the longest of those

10 sentences ought to be enough, I would guarantee that that's not

11 going to compute for any of the members of the Fourth Circuit

12 Court of Appeals.

13      MR. THOMAS:  So I appreciate the Court's comments,

14 your Honor.  This is how -- this would be my response to that.

15      First -- my argument is really twofold, that I think that

16 a sentence of less than what is called for now under the

17 guidelines is appropriate in this case.  That's first.

18      Secondly, I think we can disagree, obviously, on the

19 amount of that departure.  I think that 3553 -- and I'm

20 probably going to butcher the language, but there is what is

21 referred to as the parsimony provision, that this Court has to

22 impose or should impose a sentence that is not one day more

23 than what is necessary to accomplish the -- what 3553

24 prescribes.

25      I think that a sentence of 120 months does that.  Again, I

can appreciate that, if you will, reasonable minds may differ
on that particular number.  But I think that, when weighing all
the 3553 factors, Mr. Allison's background, what he has done in
this case, the movement, if you will, from, obviously, the
challenges that presented itself from day one, I think that
sentence is appropriate.

The Court said that -- I hope I characterize it
correctly -- it's never heard of or -- of a departure that
significant.  I will say that one of the comments we talked
about earlier was this case is, I think, largely different than
anybody -- certainly myself and, I think, Mr. Kent -- has ever
really dealt with.  And I don't mean that, you know, it's not a
drug-trafficking case.  We do those all day long every day.
But the moving parts and everything that has happened, this
case is different.  Mr. Allison is different.

Mr. Allison's journey from childhood to how he has found
himself in this predicament is different.  Mr. Allison's
journey from, once he found himself in this predicament to
where we are today, is different than, I think, most
defendants.  And I think that's what I'm asking the Court to
consider to imposing a reasonable sentence in this particular
case.

THE COURT:  Well, when you say it's different, what --
not to sound flippant, but what's so different about this one?
I mean, in many respects, the difficulties that Mr. Allison has

1 had in life are very similar to ones that I see on a regular

2 basis.

3          MR. THOMAS:  And I appreciate that, your Honor.  And,

4 again, I've been in a few courtrooms, and I understand that

5 argument.

6      What I don't see -- and I will tell you what I've never

7 seen, never seen, is an individual who was learning-disabled,

8 who was impacted by his environment like it appears that

9 Mr. Allison was to do these things.  I've never seen that, and

10 so I'm asking the Court to factor that in.

11      I mean, the presentence report talks about the educational

12 testing when he was younger.  I think it was an IQ of -- and I

13 apologize if I'm incorrect -- I think it was about 71.

14          THE COURT:  I think it was 81.

15          MR. THOMAS:  Eighty-one?  But it was -- I mean, the

16 Court understands, I think, that aspect of this argument.  More

17 recently, prior counsel has provided information that suggested

18 that's 56.  I will tell you that I've never seen that.  I think

19 that's different.  And so I think all of those factors call for

20 a sentence that is --

21          THE COURT:  Well, how does a -- how does a low

22 intelligence level, which is essentially what you're arguing,

23 call for a lower sentence?  What's the connection there?

24          MR. THOMAS:  I --

25          THE COURT:  Why does that warrant -- I mean, you're

talking about a sentence that's -- I didn't do the math, but it's somewhere around a 60 percent downward variance because of intellectual difficulties.  How does that fit into the 3553(a) factors?

MR. THOMAS:  Your Honor, I believe that, in considering who this particular defendant is, if he was -- I mean, quite frankly, I don't know -- and I'm certainly not here today to argue that, you know, the plea is infirm or anything like that.  We've addressed all of that.  But there's a difference between a person who is intellectually challenged, who kind of does what he has to do, does what people encourage him to do, falls into that lifestyle at a very early age, and follows that path.

Unfortunately -- and let me just concede this point.  You know, this is not Mr. Allison's first rodeo.  He's had some opportunities -- I don't know if "opportunities" is the right word, but he has had some interactions with the system, and perhaps that system failed him.  And I'm not going to sit here, you know, and talk about the criminal justice system failed him.  But he didn't do any time on those, is really kind of what I'm getting at, no meaningful time to -- like what is going to happen today, whether the Court agrees or disagrees with me.

Those are the things that I'm asking the Court to consider with respect to 3553.  As he sits here, he is different from a

person who does not have intellectual challenges, has
opportunities, and then makes conscious decisions to forego
that and to travel down a certain path.

Again, I can appreciate the Court's argument or suggestion
that perhaps 120 months is a bridge too far, but I think, on
the other side of that, 292 months is similarly a bridge too
far. So I'd ask the Court to impose a sentence below the
guidelines in this particular case.

THE COURT: Well, one thing you haven't addressed was
the point that we left open at the conclusion of the discussion
regarding the acceptance of responsibility, because what I said
was -- I granted the three-level reduction for acceptance of
responsibility with the recognition of the fact that it's less
than a pure acceptance of responsibility, that here there was a
pretty significant failure of acceptance that was followed by a
very unorthodox, rehabilitative act, and that, since this is
one of those provisions that the guidelines require that either
the light is on or the light is off -- I said, well, okay, the
light is on, I'll allow for the three-level reduction. But I
do that in recognition of the fact that it is quite imperfect.

That would indicate to me a sentence probably higher than
the low end of the guideline range. You've already said you
think the low end of the guideline range is a bridge too far --
too high, not too low -- but you didn't even address this.

MR. THOMAS: I mean, I'm happy to now, your Honor.

1    Again, I certainly appreciate the Court's view of the
2  facts in this case in view of granting acceptance, that perhaps
3  it would be better if there was a gray area on acceptance and
4  the Court had some discretion to do some different things.  You
5  know, I'll accept that and appreciate that argument.

6    Notwithstanding that, even if the Court could have
7  said, well, you know, I'm going to give you two points, I'll
8  accept -- or, actually, I'm going to give you one point on
9  acceptance and, you know, let the Government do what the
10 Government does with its one point, we -- if that were the
11 scheme, the sentencing scheme, we'd be in a different place.  I
12 would still be arguing to you that -- where we were with
13 regards to that.

14    But, again, that type of sentence is too substantial in
15 this particular case.  And that -- and so anything within that
16 range is not necessary given the -- given 3553.  I appreciate
17 the Court's argument.  I appreciate --

18         THE COURT:  Well, I'm not arguing, I'm asking.

19         MR. THOMAS:  I appreciate the Court's question.  I'm
20 sorry if I was -- articulated that incorrectly.

21    And so I think what I'll say kind of in concluding with
22 respect to that particular question is, again, if 120 months
23 isn't the number, that there needs to be a number somewhere
24 else -- I don't want to argue against myself.  I don't want to
25 say, well, Judge, if you're not going to do 120 months, do 130.

I don't want to do that.  I mean, my argument is my argument.

   But appreciating the Court's questions and appreciating what I think is the Court's concern, my position is that a sentence of 292 months is more than what is necessary in this particular case to accomplish what 3553 directs this Court to accomplish.

      THE COURT:  You've obviously been doing this for a long time based on what you've said.  And as mentioned before, the guideline range in this case regarding the offense conduct, all of the factors, aside from what we keep referring to as the rehabilitative act, would be a sentence of 360 months to life in prison.

   From your whole career, what's a drug case that warrants 360 to life?  You say this case is one that 292 is a bridge too far.  What's a case that warrants 360 to life?

      MR. THOMAS:  Judge, I've prosecuted cases where defendants received in excess of that.  I come from -- I'll try not to delve off too far into my background.

   I have prosecuted a case in which a defendant received 440 months.  He didn't plead guilty.  He went to trial.  He was an individual who was a cartel member, so not responsible for the distribution of -- and I hope the Court can appreciate this -- small amounts of drugs.  And I appreciate that, you know, this is not -- you know, these are not eight-balls in this particular case.

1          THE COURT:  Oh, yeah.  I mean, this one is -- it works

2  out to over 16,000 kilos of converted drug weight.  I mean,

3  we're talking about huge amounts in this case.

4          MR. THOMAS:  Correct.  Correct, because of how the

5  guidelines -- because of how the guidelines treat, you know,

6  crack and how they treat meth.  I appreciate that, and that's

7  kind of why I wanted to be very clear what I'm arguing at this

8  point because the Court asked me who deserves these substantial

9  sentences.

10          This was an individual who, again, didn't go -- didn't

11  plead guilty, went to trial.  And I believe he got 420 months

12  at the end of the day, 60 months more than what Mr. Allison's

13  guidelines calculate out to be before the 5K.  This is an

14  individual who presided over an organization that was, if you

15  will, five, six times more significant that what is before the

16  this Court.

17          He was responsible for the distribution -- the importation

18  into the United States of thousands of kilograms of cocaine.

19  In that case we seized millions of dollars.  He was responsible

20  for the transportation of thousands of kilos of cocaine.  That

21  sentence for him was absolutely warranted.

22          And so I'm going to make this point, and then I'll, you

23  know, entertain any other questions that the Court has.  Had he

24  pled guilty, he'd be looking at the same amount of time that

25  Mr. Allison is -- was before his departure.

1      THE COURT:  But that's a function of the way that the
2  guideline range is -- or the guidelines are structured.  And
3  there's a point at which you cap out.  You can have -- I've
4  actually seen it recently, a case with a total offense level
5  that worked out to 55, but then that's reduced to 43 because
6  the chart only goes to 43.

7      MR. THOMAS:  And I think that's why we're talking
8  about a 3553 -- I -- 100 percent, I agree with absolutely the
9  observation the Court just made.  The Court -- but the Court's
10  question to me was, who deserves that type of sentence?

11      And Mr. Allison and that defendant are two different
12  individuals.  And for you to preside over a drug distribution
13  network in the country of Mexico and to be extradited, for you
14  to preside over a drug distribution in the country of Mexico
15  that impacts Georgia, North Carolina, Alabama -- and these are
16  all places that this distribution network impacted.  That
17  individual deserved -- there's an argument that he deserved
18  that type of sentence.  Now, again --

19      THE COURT:  There's an argument that he deserved the
20  life-imprisonment sentence, but go ahead.  Keep going.

21      MR. THOMAS:  Well, perhaps in my other life, maybe I
22  would have made -- perhaps I did make similar arguments to
23  that.  But the Court -- simply put, the Court asked me who
24  deserves that type of sentence, and that's not Mr. Allison.

25      You know Mr. Allison -- again, appreciating all the

findings the Court has made, he -- you know, these are -- we're talking about five, six, seven people at most, if I understand the facts correctly, not somebody who presided over multiple stash houses in multiple states. Okay? He does not deserve the same type of sentence that a cartel leader deserves, and that, I think, is the heart, if you will, of 3553.

If we were 10 years ago or 12 years ago, we really wouldn't be having this discussion, and I -- you know, I'd stand up and do what I needed to do, and you'd say, yeah, I appreciate that, Mr. Thomas, this guideline range is this, and, you know, we can go home now. And that would be -- but the law is clearly recognized that there are things that this Court can consider in fashioning an appropriate sentence.

THE COURT: Okay. Thank you.

MR. THOMAS: Thank you.

THE COURT: Mr. Kent, what's the position of the Government?

MR. KENT: Your Honor, it's the Government's position that the defendant should be sentenced within the range of 292 to 365 months without any downward departure or downward variance.

I believe a sentence within the range would be appropriate and sufficient. It would reflect the fact that the defendant committed a very serious offense over an extended period of time. In this case, it's clear -- the evidence is clear that

he was the driving force behind a significant conspiracy that
moved a variety of dangerous drugs to the communities in this
district.

It's one thing -- what we oftentimes see with drug
defendants in these cases is -- one thing is they go from being
the user to being the dealer, and they wind up adding to the
problem, helping to drive the misery.  It's something entirely
different -- whether it's this district or Atlanta or south
Texas -- to be the person that is the driving force behind the
conspiracy because you are the one that's actually driving the
misery within the community.  And here, this is a community
that's very close to this courthouse.  Bartlett Arms is just
about less than, I think, nine-tenths of a mile from this
courthouse.

I understand there's oftentimes a natural inclination
between prosecutors, agents, defense attorneys to compare.
What is this case like compared to Atlanta?  What this case
like compared to New York City?  And I've done those cases.
I've traveled all around the country doing those cases.

My concern is what is the impact within this community?
And within this community, when we look at the drug quantities
the defendant is now held responsible for -- and I think
everyone understands the conspiracy case.  Those are really
just a snapshot of what was actually going on.  But if you use
standard user quantities, that's more than 2,000 individual

user quantities of heroin, and it's more than 35,000 individual user quantities of methamphetamine. So it is significant within this district.

Now, I think what's important to recognize -- one of the things that's important to recognize is the fact that this defendant set himself apart from a typical dealer in this district. I've said most often, especially in meth cases, that the dealer was a user first. But there's no evidence in the PSR that this defendant first was addicted to crack or heroin or methamphetamine. So what that says to me, in my years of experience, is that this was about money. This was about bettering himself.

In most drug cases, you're just talking about a single firearm. Here, we have multiple, numerous firearms in two different locations, all of which were loaded. In most cases, we're lucky to find a stash house. Here, we have two surveillance system, camera-protected stash houses.

Most times, as I said earlier, the leadership or role enhancements don't necessarily fit the evidence in the case. But here, it fits it to a tee. And probably the saddest example of that was Mr. Downs, who argued or stated on his behalf at his sentencing that it was the defendant that was the one that pushed him, directed him into the most serious part of this conspiracy, which in the end, having listened to those jail calls leading up to the last April 2020 setting of this

case for sentencing, you know, Mr. Downs had been taken away
from his daughter in large part, in that 108-month sentence,
because of the defendant pushing him to the more serious part
of the conspiracy.

His disrespect for his community and the law was really
never, I think, better illustrated than his disrespect for this
Court when -- and we have an obstruction enhancement to take
care of that, to address that. But I think that was
indicative, the fact that he would file these affidavits, under
penalty of perjury, and make false claims about them, which was
actually shortly before this 38-count indictment dropped on
him, showed that he really had this attitude of he could do
whatever he wants, wherever he wants. And that was an attitude
that we saw in the Bartlett Arms, especially talking to the
people in the community there and -- which is why they feared
him so much.

A guideline sentence in this case would promote respect
for the law and would provide adequate deterrence. It's
certainly clear that the defendant -- and I think counsel would
agree -- has had a number of issues with deterrence in the
past. He's in the second-highest criminal history category
possible. He has a history of disrespect for the law and those
that enforce it.

His prior convictions for giving false information to law
enforcement, obstruction, fleeing or attempting to elude,

escape, and assault on a law-enforcement officer inflicting
serious injury -- and coming into this case, he also had
multiple prior felony convictions.  This is now his fourth
narcotics-trafficking felony conviction.

I can't say I've had a defendant with that record, just
narcotics-trafficking convictions alone, where there's any sort
of credible argument that, in some way, he deserves the bare
minimum or the statutory minimum called for by Congress.  If
anything, he has become the poster child for doing what you
want without regard to the safety of others, without regard to
what the law will do to you, and with regard to the fact that
you've been convicted multiple times and have gone to prison,
maybe not long periods of time, you're still just going to do
whatever the heck it is you want to do.

He does have a low IQ.  I think the report that
Mr. Devereux, former counsel, had submitted shows that is
consistent with what was in the PSR.  But there's a couple
issues with that.  It doesn't tell the whole story.  What
really does?  Sitting down with someone for two days, not with
them in their environment in which they had been functioning,
dealing drugs, is very different than sitting down with them in
an office space or in a jail.

I've had defendants with low IQs in conspiracy cases.
Those folks are usually relegated to being lookouts.  Those
folks are usually relegated to being -- in one sad case, being

given color-coded bags to tell you what kind of drug it was so
you could walk up the two blocks from the stash house to the
dealers.  But that's not the defendant.

So you can have a low IQ -- I've met plenty of folks that
do -- but are highly functioning.  And they have an ability --
they have skills that most people who are educated or have high
IQs don't.  You can have a low IQ and be a very successful drug
dealer, and he was in this case.  He was making so much money,
he obviously had to have a money counter in his residence,
where there was $100,000 in cash.  That's incredibly
significant.

I asked ADA Sprinkel, who I mentioned in my 5K motion,
about this idea of an IQ, understanding that you can have one,
but that doesn't necessarily means that it affects every aspect
of your life because, when he sat down with the folks from
Atlanta, obviously any defendant wants to put their best foot
forward.

So I explained to him, after he interviewed him, what was
in the report and what the allegations were with regard to his
IQ and how it affects him, and he was surprised.  He didn't
view him as someone as -- as someone who was a potential
witness, he didn't view him as someone who had an incredibly or
extremely low IQ.  He found the defendant engaging and someone
who could recall specific facts from long periods of time ago
and relay them in an articulate manner to them.  So while he

does have a lower IQ, it certainly does not ever appear to have

impacted his ability to successfully engage in this conspiracy.

The sentence of 120 months requested by the defense, if

you were to grant that variance, as your Honor pointed out,

that's, I calculated, about 59 percent below the low end of the

range.  It's 172 months off the bottom of the range.  The

reasons that have been offered in writing or here in court are

not all that significant in the sense that the background,

unfortunately, after doing this for multiple decades, is a

pretty common background in drug cases.

His cooperation is obviously, from the Government's

perspective, already accounted for in the 5K motion.  I'll say

a couple of things on that.

I think, if I were to go in front of a conference of

prosecutors and lay out the facts and the substances and say

this is what I did, half of those people would disagree and say

don't file the 5K.  I did what I believe was correct, given

that final act of cooperation that he did, but it's not without

some skepticism.

And the skepticism is prior to the threats that have been

described recently.  I was never made aware, prior to recently,

that there had been threats.  I was told by Mr. Devereux that

an Atlanta-based attorney had met with the defendant, advised

him against cooperating -- not these folks here -- and that put

some pressure on him, but I was never told anything about

people were threatening him or his family.  And given the
issues, particularly going into the last sentencing date, I was
concerned about the veracity of those claims.

What I don't have a question about is some of the threats
that were laid out in the 5K motions for the cooperating
codefendants, who experienced pressure being put on them or
don't cooperate with the Government, which they're alleging was
coming from the defendant and/or his family.  We had one person
specifically who was in a position to cooperate, but refused to
because he was afraid of the defendant.  So I think any threats
that they're alleging now, while I have some skepticism, have
to be balanced against the threats made against the other
cooperators.

The last thing I'll talk about is this idea of sentence
disparity.  Your Honor oftentimes says comparing a sentence is
like comparing apples and oranges, so I did take the time to
look at each of the defendants.  And I'll just summarize, not
individually, but as a group, the differences between them and
this defendant.

Only one codefendant had a starting base offense level
equal to the defendant, and that was Mr. Odum.  I'll talk about
him momentarily.  Three were two offense levels lower, one was
four offense levels lower, and two were 10 offense levels
lower.  Four of the codefendants with lower base offense levels
were involved in a single incident during the course of the

conspiracy, whereas this defendant's involved and played out over the course of two years.

Coming to Mr. Odum, who had a similar starting offense level, he only had one applicable enhancement, compared to the defendant. He cooperated earlier than the defendant. He cooperated against the defendant. His cooperation was more substantial, and he received more levels off. There was no question from the Court as to whether or not he deserved those levels. And in addition, the Court varied because of some medical conditions that he had.

Going to criminal history categories, only one defendant had an equal to or greater criminal history category than the defendant, and that was Mr. Wright, who I'll talk about in a moment. Three of the codefendants were two criminal history categories lower, and three of them were in the lowest criminal history category possible.

And looking at Mr. Wright, unlike the defendant, he only had one applicable enhancement. He cooperated early. Again, he cooperated against the defendant. He also cooperated, as I said earlier, against another dealer that I was prosecuting at the time. He was then sentenced to 360 months to life after losing acceptance of responsibility, in part based on the information provided by Mr. Wright. So his cooperation was certainly more substantial, and he received more levels off. The Court didn't vary in his case any additional time.

And Miss Shuping is sort of the outlier. She is the
lowest sentence in the case, but she is responsible for far
less drugs than anyone. She was the first person that we
encountered and then flipped, if you will. Single incident,
single criminal history point, lowest criminal history
category, no enhancements, eligible for safety valve, most
significant cooperation, doing the most significant buys in the
case. And even then, the Court didn't vary further after her
cooperation.

I think the only significant disparity that exists in the
case is based on the defendant's own actions. He was the
leader in drug quantities, he was the leader in applicable
enhancements, he has among the worst criminal history category
in the case, and he was the driving force behind the
conspiracy.

What they're asking for -- departing 59 percent or
172 months -- runs contrary to the guidelines, to the
3553(a) factors, and the weight of the evidence against the
defendant. The truth is, although he has a low IQ, he is a
hustler. He is savvy. He may be a compassionate, caring, and
extraordinary man to his friends and family, which I read in
the letters. But to the people of Bartlett Arms and to the
folks that traffic drugs with him, he was clearly someone to be
feared.

The Government believes this defendant deserves every day

1  of a guideline sentence. And I think the Court should take

2  into account, when deciding where within the range to sentence

3  the defendant, that his acceptance of responsibility was less

4  than full. It should take into account the fact that, despite

5  the Government seeing some good, it was clear, for a

6  significant amount of time, that the defendant was gaming the

7  system, that his acceptance was less than pure, and that his

8  failures, prior to the Swain County detention facility

9  cooperation or prior to now withdrawing objections, was a very

10  significant failure.

11      For those reasons, I'd ask you to sentence the defendant

12  within the range, your Honor. Thank you.

13          THE COURT: Thank you.

14      Mr. Allison, at this time you have the opportunity to

15  address the Court and to tell me anything that you feel I

16  should know before I make my decision regarding your sentence.

17          THE DEFENDANT: Your Honor, Judge Reidinger, I want to

18  say that, you know, I'm sorry for any of my wrong that I've

19  done. But I want to say that, since I've been incarcerated,

20  I've had the COVID. It made my diabetes worse. I have to take

21  two shots a day and that my life is in your hands right now,

22  your Honor. My life is in your hands. My son, my wife, my

23  family life is in your hands today.

24      And that -- what I did at Swain County, I just felt that I

25  didn't -- I did it to save some lives because some officers was

1  about to get killed down there that day.  I just called my

2  lawyer, let them know what was going on, your Honor, not

3  because of the -- I thought it was just the right thing to do.

4       Trying to change my life, your Honor.  And growing up as a

5  kid, that's all I was around, your Honor, was -- I grew up in a

6  drug-infested neighborhood.  My mom had 16 kids, and I had to

7  do the best that I had to do to get -- to eat a meal, your

8  Honor.

9       Like this guy, he had me selling drugs for him at a

10  younger age.  And if I didn't sell the drugs or if I messed up,

11  he had a cage, your Honor, that he would put me in and make me

12  take -- make me suffer in this cage.  And I just trying to make

13  money to make sure me and my sisters and my little brothers,

14  we ate.

15       And it just -- you hold my life, your Honor.  I want to

16  get back to see my kids, my son -- my son that --

17            THE COURT:  Take your time, Mr. Allison.

18            THE DEFENDANT:  I hate my son has to sit here and see

19  me going through this.  I got a son out there with a bullet in

20  his head.  He's suffering from a brain injury.  And I got a

21  daughter, she got lupus.  I was her caregiver, and I'm all they

22  have.

23       It's just I been through a lot in my life.  When I was

24  young, your Honor, been through a lot.  I watched my mama die.

25  I sit at a young age and watched my mama die.  I watched my

daddy die.  I got 14 children that I was raising, your Honor,
but I take care of my children.

And just to make me lose my wife, my family -- you hold
the key to my life in your hands, your Honor.  I'm sorry for
all my wrongs that I done.  That's all that I knew.  That's all
I knew just growing up.  Didn't have nobody to tell me this and
that.  Growing up, I was picked on a lot.

And you just hold my life, your Honor.  And I don't want
no people to get hurt while I was at that jail.  I didn't want
nobody to get hurt.  I thought it was the right thing to do,
your Honor, because they was already talking about what they
was going to do when the polices came in, once they got the
guns and the drugs in there.

I called my lawyer late that night, and I told him I don't
want to have no part to this.  I don't want to be a part in
this.  You know, this ain't right for them guys -- I didn't
want to end up seeing myself get hurt in that.  I don't want to
die -- I don't want to die in jail, your Honor.  I don't want
to die.  I'm already in my 40s, my late 40s.

I don't want to die, your Honor.  My life has changed,
your Honor, and I'd ask you for one more chance, your Honor,
with my life.  I just want one more chance with my life.  And,
your Honor, you -- I beg of you and I ask for you, your Honor,
just for one more chance.  I don't want to die in here.  I got
my younger son, my kids.  They need me.

1      And I beg of you, I beg you, please, your Honor, please.

2  Just one more chance, your Honor, please.  Please, one more

3  chance, and I promise you you will never see me again.

4            THE COURT:  Anything else, Mr. Allison?

5            MR. THOMAS:  Thank you, your Honor.

6            THE DEFENDANT:  Excuse me, your Honor.  Can I give my

7  son a hug?  Can I give him a hug, your Honor?  I ain't touched

8  my son in three years.

9            THE COURT:  Well, I understand that, but you're in the

10  custody of the marshals, and I'm sure that the marshals' rules

11  involve that you can't have any physical contact with any other

12  person who's on the other side of the bar.

13            THE DEFENDANT:  Your Honor, I don't want to die -- I

14  don't want to die in here, your Honor, please.

15            THE COURT:  Well, ordinarily I'd pronounce sentence

16  first and give my reasons after.  But in light of the

17  complexity of this particular case, I want to do some -- put

18  some of my reasoning on the record before I pronounce the

19  sentence.

20      I -- in many respects, I find this case to be difficult

21  because of the novelty of the issues that it presents.  All of

22  the facts and circumstances that are presented in the

23  Government's downward departure motion to me, at least, make

24  this case much more complex.  Were it not for those facts and

25  circumstances -- both beneficial to the defendant, as well as

negative for the defendant -- this would be, in many respects, an ordinary case.

When I say "ordinary," it's not ordinary in the sense that it involves ordinary quantities of these controlled substances because, in that respect, this is an unusual case because of the very large quantities, as I mentioned. This case involves in excess of 16,000 kilograms of converted drug weight. That is -- that's a phenomenal quantity for which the defendant is responsible and for which the defendant does not dispute.

And if I were only looking at the offense conduct and the seriousness of the offense and how large a quantity of deadly drugs we were talking about in this case, there is little doubt in my mind that this case is one just like others that I've had here that would fall into that range of a sentence of 360 months to life in prison.

That is a good measure of the seriousness of the offense, and I think that that's borne out by even comparing the defendant's guideline range before the 5K to his codefendants because these are the codefendants who were involved in these various pieces of the conspiracy that the defendant was the hub of the wheel.

And there are a couple of them who received a sentence of 108 months, including one who, as part of his factual basis that he admitted to, said that he was brought into the

conspiracy at the behest of the defendant in this case, and yet he received 108 months. His drug quantities were much, much lower, were a fraction of what this defendant is responsible for.

It also concerns me with regard to the deterrent effect because Mr. Allison here has received very long sentences, previously a 15-year sentence and a 10-year sentence. Now, there were reasons why he did not serve all of that 15 years and 10 years, but he's received long sentences before, and yet they did not deter the sort of extreme conduct that we have in this case. And as such, the nature and circumstances of the offense and the history and characteristics of the defendant call for a very long sentence.

Then, layered on top of that, there are the negative things that are set forth in the Government's downward departure motion, which the Government obviously feels -- and I believe rightly feels -- are outweighed to some degree by the particular cooperation that the defendant gave regarding the incident at the Swain County detention facility.

So it's -- the process of applying the 3553(a) factors, to me, becomes this process of looking at this case separate and apart from the events at Swain County and then figuring what reduction is warranted by that level of action, that positive action on the part of the defendant.

I also need to take into account to some degree what the

defendant has overcome because, even though in many respects
the defendant's background is not remarkable, it is a
background that unfortunately I see all too often, of one who
comes from a very difficult background, a background that was
essentially devoid of guidance, having intellectual
difficulties, all of those factors, but yet emerging from that.

And that's worth something, as well, but it is worth
something based on the degree to which the -- not just this
defendant, but any defendant who's in that situation has acted
to overcome those sorts of obstacles in life.

And here, while defense counsel has focused a great deal
on the obstacles, defense counsel hasn't focused a whole lot on
the overcoming of those obstacles.  So it's worth something,
but, again, it is a mitigating factor that is of some limited
application in this case.

Having said that, I will pronounce sentence.  Mr. Allison,
I need for you to stand for the application -- for the
pronouncement of the sentence.

Pursuant to the Sentencing Reform Act of 1984 in the case
of the Unites States versus Booker, its the judgment of this
Court, having considered the factors noted in 18 U.S.C.
Section 3553(a), that the defendant, Rodney Dejuan Allison, is
hereby committed to the custody of the United States Bureau of
Prisons to be imprisoned for a term of 310 months.

The Court recommends that the defendant be allowed to

participate in any educational and vocational opportunities
during the period of incarceration.

THE DEFENDANT:  (Inaudible.)

THE COURT:  The Court calls to the attention of the
custodial authorities that the defendant has a history of
substance abuse and recommends that the defendant be allowed to
participate in any available substance-abuse-treatment programs
while incarcerated and, if eligible, to receive the benefit of
18 U.S.C. Section 3621(e)(2).

The Court calls to the attention of the custodial
authorities that the defendant has a history of mental-health
issues and recommends that the defendant be allowed to
participate in any available mental-health-treatment programs
while incarcerated.

THE DEFENDANT:  My life.  That's my whole life.
That's my life.

THE COURT:  It is ordered that the defendant be
required to support all dependents from prison earnings during
the period of incarceration, as outlined in the presentence
report.

Upon release from imprisonment, the defendant shall be
placed on supervised release for a term of eight years.

THE DEFENDANT:  It ain't right.

THE COURT:  Within 72 hours of release from the
custody of the Bureau of Prisons, the defendant shall report

1  in-person to the probation office in the district to which the

2  defendant is released.

3      While on supervised release, the defendant shall not

4  commit another federal, state, or local crime and shall comply

5  with the standard conditions of supervised release as those

6  have been adopted by the Court in the Western District of North

7  Carolina.

8      In addition, the defendant shall comply with the following

9  additional condition.  The defendant shall participate in a

10  mental-health evaluation and treatment program and follow the

11  regulations of that program.

12      The probation officer, in consultation with the treatment

13  provider, will supervise the defendant's participation in the

14  program, including, but not limited to, the provider, location,

15  modality, duration, and intensity thereof.  The defendant shall

16  take all mental-health medications as prescribed by a licensed

17  healthcare practitioner.

18      It is ordered that the defendant shall pay the United

19  States a special assessment in the amount of $100.  The Court

20  finds that the defendant does not have the ability to pay a

21  fine or interest, and, having considered the factors noted in

22  18 U.S.C. Section 3572(a), the Court will waive the payment of

23  a fine and interest in this case.

24      The defendant shall forfeit his interest in those

25  properties as identified in the consent order and judgment of

forfeiture that is being entered contemporaneously with this
judgment.

Payment of the criminal monetary penalties shall be due
and payable immediately. The Court has considered the
financial and other information contained in the presentence
investigation report and finds that the following is feasible.

If the defendant is unable to pay my monetary penalty
immediately, during the period of imprisonment, payments shall
be made through the Federal Bureau of Prisons Inmate Financial
Responsibility Program. Upon release from imprisonment, any
remaining balance shall be paid in monthly installments of no
less than $50 to commence within 60 days of release until paid
in full.

Throughout the period of supervision, the probation
officer shall monitor the defendant's economic circumstances
and shall report to the Court with recommendations as warranted
any material changes that affect the defendant's ability to pay
any court-ordered penalties.

Again, with regard to my reasons for imposing the sentence
that I have, I've explained most of those reasons before I
pronounced sentence. But particularly, looking at the
seriousness of the offense -- and here it's the seriousness of
the offense based on the prodigious quantity of very dangerous
controlled substance. And, of course, the guidelines here,
with regard to controlled-substance offenses, are driven

largely by the quantities that are involved.  And here, this
may not be the highest quantity that I've dealt with in a case,
but it's among the highest.  It's certainly a substantial
amount.  And it's not only that it was the quantities here, but
it was the different drugs, the dangerousness of those drugs,
the presence of the firearms, and then the fact that the
defendant had not been deterred by his prior prosecutions and
sentences.

Like I said in the earlier part of my explanation, were it
not for the element having to do with the incident down at the
Swain County detention facility, the sentence would have been
in line with other sentences that I have imposed in drug cases
of this -- of this extent, would have been a sentence somewhere
between 360 months and a life term in prison.

But I have obviously taken a substantial amount off of
what that sentence would have been in light of the defendant's
actions in bringing that issue to the attention of the
authorities through his attorney and also to the extent that
the defendant had the change of heart, change of mind,
regarding acceptance of responsibility.  And that has been
taken into account, as well, even though that acceptance of
responsibility was less than perfect.

So for all of those reasons -- and I will reiterate one
thing that was alluded to by the assistant United States
attorney, and that is I have found in this case -- as I find in

1  many cases that Mr. Kent handles, since he handles most of the

2  drug cases -- his approach in this case has been what I would

3  find to be considerably lenient compared to what I believe

4  other prosecutors would have done.  And I believe that that has

5  led me to a sentence that is consistent with that leniency that

6  he has advocated.

7       So for all of those reasons, I have imposed the sentence

8  that I have.

9       Mr. Thomas, are there any other issues regarding either

10  the sentence or the judgment that we need to address?

11       MR. THOMAS:  I'd ask just a couple of housekeeping

12  matters for the defense, your Honor.  First --

13       THE COURT:  I need for you to talk into the

14  microphone.  You've stood to the side, and I'm having trouble

15  hearing you.

16       MR. THOMAS:  Just a couple housekeeping matters for

17  the defense, your Honor.  First, I don't know what this Court's

18  practice is.  In Atlanta, typically I'd ask for a

19  recommendation to a facility -- a facility that is close to --

20       THE DEFENDANT:  (Inaudible.)

21       MR. THOMAS:  -- to a facility where he can be close to

22  his family members.

23       THE COURT:  Well, do you have a particular location?

24  Do you want me to designate him as close as possible to Atlanta

25  or Asheville?

1          MR. THOMAS:  Atlanta, your Honor.

2          THE COURT:  In the judgment, the recommendation that

3    the defendant be placed as close as possible to Atlanta,

4    considering his security classification.

5          MR. THOMAS:  Thank you, your Honor.  And then I think,

6    if this is the appropriate place for just objections to the

7    sentence, we would object to the Court not granting our

8    objections for the firearm enhancement or adjustment for the

9    premises objection and the role of the offense.  Lastly, we

10   would object to the extent or the lack thereof of the departure

11   pursuant to 3553 with respect to reasonable sentence.  And then

12   finally, in a similar vein, to the extent of departure with

13   regards to the 5K.

14         THE COURT:  Well, I believe all of your objections are

15   preserved.  And to the extent they're not, you've certainly

16   placed them on the record now.  And I believe -- I hope -- I

17   have addressed each of those issues adequately on the record so

18   that any Appellate Court understands how I ruled and why I

19   ruled the way that I did.  In fact, on some of those that

20   you're objecting to, I actually have ruled in your favor, just

21   not to the extent that you feel that those particular factors

22   apply.

23         But with regard to any of the variance factors, I found

24   that they warranted some degree of downward adjustment to what

25   the sentence otherwise would have been.  And I hope that that

1 was clear on the record.

2        MR. THOMAS:  It was indeed, your Honor.  I just -- by

3 way of sort of explanation -- and again, the Court appreciates,

4 I think, that we practice in the Northern District mostly, and

5 that's just -- traditionally, we are required to preserve those

6 objections after the sentence is pronounced.

7        THE COURT:  And I certainly want you to preserve every

8 objection that you feel you might want to take up on appeal.

9        MR. THOMAS:  Thank you, your Honor.

10        THE COURT:  I know some judges are insulted by having

11 their cases taken up on appeal.  I'm not one of those.  If I've

12 made an error and Mr. Allison is entitled to some sort of

13 relief that I have not taken into account, we'll come back, and

14 we'll do this all again.

15        MR. THOMAS:  Thank you, your Honor.  We appreciate

16 that.

17        THE COURT:  Anything else, Mr. Thomas?

18        MR. THOMAS:  I don't believe so, your Honor.  I

19 believe that takes care of things for the defense.

20        THE DEFENDANT:  Can I say something, your Honor?

21        THE COURT:  Well, I suggest that you talk to your

22 attorney before you say anything because it would be on the

23 record.

24        THE DEFENDANT:  (Inaudible.)

25        MR. THOMAS:  Thank you, your Honor.  I believe that's

1  going to take care of us for today.

2      THE COURT:  Okay.  Mr. Kent, anything else for the

3  Government?

4      MR. KENT:  Just in keeping with the plea agreement,

5  the Government moves to dismiss Counts 2 through 4, 7 through

6  9, 12 through 17, 20, 23, and 28 as to Mr. Allison in the

7  superseding Bill of Indictment, your Honor.

8      THE COURT:  And those counts in the superseding

9  Bill of Indictment as to Mr. Allison -- Counts 2 through 4,

10  7 through 9, 12 through 17, 20, 23, and 28 -- are hereby

11  dismissed.

12      Anything else, Mr. Kent?

13      MR. KENT:  No, your Honor.

14      THE COURT:  Mr. Allison, you have the right to appeal

15  this sentence to the Fourth Circuit Court of Appeals.  You have

16  pleaded guilty pursuant to a plea agreement, and that plea

17  agreement includes some waivers that may substantially affect

18  your appeal rights.  You will need to consult with your

19  attorney as to what affect those waivers may have on your --

20  any of your appeal rights.

21      However, if you choose to appeal, you must file a written

22  notice of appeal with the clerk of this court within a period

23  of 14 calendar days following the date of the entry of the

24  final judgment in this case.

25      If you wish to appeal, but do not have the funds with

1 which to appeal, you may file an affidavit of indigency, and,

2 if approved by the Court, you may appeal at Government expense.

3     Do you understand this right of appeal as I have

4 explained it?

5     THE DEFENDANT: (No response?)

6     THE COURT: Mr. Allison, do you understand that right

7 of appeal?

8     THE DEFENDANT: (The defendant shook his head from

9 side to side.)

10     THE COURT: You do not? Do I need to explain it

11 again?

12     MR. BANKS: If we can just have a moment, Judge.

13     THE COURT: You may.

14     (Discussion off the record.)

15     MR. BANKS: Thank you, Judge.

16     THE COURT: Okay. Mr. Allison, do you want me to

17 explain these appeal rights a second time or do you understand

18 them?

19     THE DEFENDANT: (No response.)

20     THE COURT: Well, it -- out of an abundance of

21 caution, even though I believe I have explained them clearly, I

22 will go through each of these points again and go through them

23 slowly with the hope that they are fully understood.

24     First of all, Mr. Allison, you have a right to appeal.

25 What you might appeal is the sentence.

1    Now, your appeal rights may be very limited.  You have

2  pleaded guilty pursuant to a plea agreement.  That plea

3  agreement includes some provisions in there whereby you agreed

4  to waive a number of your appeal rights, but --

5          THE DEFENDANT:  Nah.

6          THE COURT:  -- but you didn't waive all of them.

7  Therefore, if you're wanting to appeal, you're going to need to

8  talk to your attorneys to find out what appeals rights you have

9  given up and what appeal rights you still have.

10    But if you choose that you want to appeal, you have to

11  file a written notice of appeal.  You have to file that written

12  notice of appeal with the clerk of this court -- not the Court

13  of Appeals, this court.  You have to do it within 14 days --

14  and that's calendar days -- of the date on which the judgment

15  in this case, the paper judgment, is entered.

16    If you wish to appeal, but do not have the funds with

17  which to appeal, you have to file an affidavit of indigency.

18  If that affidavit is approved by the Court, you may be able to

19  appeal at Government expense.

20    Do you understand that right -- your appeal rights as I

21  have explained?

22          THE DEFENDANT:  I'm trying to figure out why did I

23  agree to all them drug quantities, all that stuff.  I don't get

24  it.  I ain't getting it.

25          THE COURT:  Well --

1    THE DEFENDANT:  I just ain't getting it.  I don't
2 understand it, man.  I don't know Jeffery (phonetic).  I never
3 knew that man.  I don't know him.

4    THE COURT:  Mr. Thomas, do you feel that there is any
5 benefit to further trying to explain the appeal rights to
6 Mr. Allison?

7    MR. THOMAS:  This has been an afternoon for difficult
8 questions for me, Judge.  Your Honor, I believe you've advised
9 him on the record, and I don't that we'd get much further with
10 the -- further discussion with regards to that.  I can tell you
11 Mr. Banks and I will discuss with Mr. Allison the next steps in
12 this matter.

13    THE COURT:  Well, and to that end, obviously, I have
14 explained the appeal rights twice, once with the specific
15 script that the law requires and, secondly, with some
16 explanation.  And, of course, there is a court reporter here,
17 so that has been taken down verbatim.  And to the extent that
18 it may be needed, a transcript can be ordered of those appeal
19 rights as I spoke them from the bench and that they may be
20 repeated to Mr. Allison and, with the assistance of counsel,
21 may be explained to him in greater detail, and any questions
22 that he may have can be answered at that time.

23    But I believe that I have adequately explained what the
24 appeal rights are.  And, of course, he is represented by very
25 competent counsel.  And, therefore, any appeal that may be

1  forthcoming can be filed in the appropriate manner within the

2  appropriate time.

3       Is there anything else that we need to address before we

4  recess?

5       MR. BANKS:  Judge -- and I'm sorry.  I know Mr. Thomas

6  is lead, but, in speaking with Mr. Allison, I would just

7  respectfully request that the Court grant him the credit for

8  time that he's served while in custody.  I know that that is a

9  fact that the Federal Bureau of Prisons addresses, but I

10 believe he's been in custody now for over three years, since

11 his initial arrest.  I would ask that, from the date that he

12 was arrested by federal authorities, that this Court give him

13 that credit.

14       THE COURT:  Well, credit is calculated by the Bureau

15 of Prisons.  My understanding, though from looking at the cover

16 page of the presentence report is that, even though he was

17 originally taken into custody on state charges, he was not

18 writted over to federal court, but, rather, he was released on

19 bond by the state and then arrested by the marshal service on

20 the federal charges.

21       Therefore, assuming that that is correct, it is my

22 estimation that the Bureau of Prisons would give Mr. Allison

23 credit from the date of that federal arrest, which according to

24 the face of the presentence report occurred on April 10th,

25 2019, and that would be the day on which the service of

1  sentence would begin to run.

2      Now, there were a lot of provisoes in there because I'm

3  only going on the face of the presentence report.  And if the

4  Bureau of Prisons calculates it differently, there isn't

5  anything I can do about it because that's an executive

6  decision.  But I hope, Mr. Banks, that at least answers the

7  questions that you were presenting.

8          MR. BANKS:  It does, Judge.  Thank you, your Honor.

9          THE COURT:  Okay.  Anything else that we need to

10  address?

11          MR. THOMAS:  No, your Honor.  I just want to add I

12  appreciate the Court's indulgence with respect to our little

13  misstep with regards to that initial filing.  We'll get that

14  taken care of, as well.

15          THE COURT:  Well, and like I said with regard to that

16  filing, I don't want you to feel as though I'm chastising you.

17  It is just we have that local rule in place because it

18  facilitates the adequate preparation.  I got to this courthouse

19  at six o'clock this morning, and one of the reasons I did was I

20  had been told by my assistant that that had been filed, and I

21  knew I needed to read it before this hearing, and I knew I was

22  going to be in court all morning.  So --

23          MR. THOMAS:  I understand, your Honor.

24          THE COURT:  So be that as it may, the only thing is

25  you made me get here early, and I don't hold that against you

1  as to that.  But I do bring it to your attention in case you're

2  ever back here because you might be -- you're a very good

3  lawyer, you defend your client well.  And to that end, I

4  wouldn't mind seeing you back here one bit.

5          MR. THOMAS:  Thank you, Judge.  I have been chastised

6  by the Court before, and this does not feel like that

7  experience.  So again, I appreciate the indulgence, and thank

8  you, your Honor.

9          THE COURT:  Very good.  I appreciate everybody's

10 preparation.  As I said, this has been a very difficult case

11 that has a lot of twists and turns to it, has a lot of

12 difficulties to it.  But I very much appreciate the way both

13 sides have been very well-prepared for all of those issues and

14 the way that you have presented yourselves here today.

15         MR. THOMAS:  Thank you, your Honor.

16         THE COURT:  So with that, marshal, please recess us

17 until further calling.

18      (End of proceedings.)

19

20

21

22

23

24

25

C E R T I F I C A T E

       I, DEBORAH COHEN-ROJAS, Federal Official Court Reporter for the United States District Court for the Western District of North Carolina, a Certified Shorthand Reporter, Registered Diplomate Reporter, and Certified Realtime Reporter, do hereby certify that I reported by machine shorthand the foregoing proceedings contained herein on the aforementioned subject on the date herein set forth, and that the foregoing pages constitute a full, true and correct transcript.

       Dated this 3rd day of April, 2022.

_____
DEBORAH COHEN-ROJAS
CSR, RDR, CRR
Federal Official Court Reporter